IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS LLC,

                Plaintiff;

      v.

CATERPILLAR INC., KOMATSU
AMERICA CORP., VOLVO
CONSTRUCTION EQUIPMENT NORTH
AMERICA, LLC and ASSOCIATED
AUCTION SERVICES, LLC d/b/a CAT
AUCTION SERVICES,

                Defendants.

Civil Action No. 15-108-RGA

MEMORANDUM OPINION

John W. Shaw, Esq., Shaw Keller LLP, Wilmington, DE; David Boies, Esq. (argued), Boies, Schiller & Flexner LLP, Armonk, NY; James P. Denvir, Esq., Christopher G. Renner, Esq., Boies, Schiller & Flexner LLP, Washington, DC, attorneys for Plaintiff International Construction Products LLC.

David J. Baldwin, Esq., Janine L. Hochberg, Esq., Potter, Anderson & Corroon LLP, Wilmington, DE; Robert J. Brookhiser, Jr., Esq. (argued), Robert G. Abrams, Esq., Gregory J. Commins, Jr., Esq., Danyll W. Foix, Esq., Baker & Hostetler LLP, Washington, DC, attorneys for Defendant Caterpillar Inc.

M. Duncan Grant, Esq., James H. S. Levine, Esq., Pepper Hamilton LLP, Wilmington, DE; Jeremy Heep, Esq. (argued), Robin P. Sumner, Esq., Melissa Hatch O'Donnell, Esq., Pepper Hamilton LLP, Philadelphia, PA, attorneys for Defendant Volvo Construction Equipment North America, LLC.

Denise S. Kraft, Esq., Brian Biggs, Esq., DLA Piper LLP (US), Wilmington, DE; David H. Bamberger, Esq. (argued), Katherine M. Ruffing, Esq., James F. Reardon, Esq., DLA Piper LLP (US), Washington, DC, attorneys for Defendant Komatsu America Corp.

Edward F. Eaton, Esq., Connolly Gallagher LLP, Wilmington, DE; Quentin R. Wittrock, Esq. (argued), Gray Plant Mooty, Minneapolis, MN, attorneys for Defendant Associated Auction Services LLC d/b/a Cat Auction Services.

January 21, 2016

*Richard G. Andrews*

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are motions to dismiss filed by defendants Caterpillar Inc., Volvo Construction Equipment North America, LLC, Komatsu America Corp., and Associated Auction Services LLC ("AAS"). (D.I. 27, 28, 30, 33). Defendants request dismissal pursuant to Fed. R. Civ. P. 12(b)(6). The issues have been fully briefed. (D.I. 35, 36, 38). Oral argument was held on October 20, 2015. (D.I. 44). For the reasons set forth herein, the motions to dismiss are **GRANTED**.

## I.    BACKGROUND

On January 29, 2015, International Construction Products LLC ("ICP") brought this antitrust action against Caterpillar, Volvo, Komatsu, and AAS. (D.I. 1). ICP imports and sells heavy construction equipment. (*Id.* ¶ 7). Caterpillar, Volvo, and Komatsu (the "Manufacturer Defendants") manufacture heavy construction equipment. (*Id.* ¶¶ 8-10). AAS facilitates auctions of used heavy construction equipment. (*Id.* ¶ 11). ICP's claims relate to violations of the Sherman Act, the Clayton Act, and state law. (*Id.* ¶¶ 113-52). More specifically, ICP alleges a group boycott, exclusive dealing, various monopolization claims, and unlawful merger. (*Id.*). I will summarize the relevant allegations of the complaint.

ICP alleges that, in the United States, the market for the sale of new heavy construction equipment is highly concentrated. (*Id.* ¶ 21). Defendant Caterpillar accounts for approximately 40 percent or more of all sales. (*Id.*). Komatsu accounts for more than 15%. (*Id.* ¶ 21). Volvo has a market share of more than 5%. (*Id.* ¶ 44).

Manufacturers of new heavy construction equipment typically sell equipment to local dealers throughout the country, who take title and resell the equipment to end users. (*Id.* ¶¶ 19, 20, 39). End users rely on these local dealers for service and support and therefore do not

typically purchase new equipment from dealers without an authorized service location within 75 miles. (*Id.* ¶ 38). This in turn means that prices may vary in different states and regions within states. (*Id.*).

ICP alleges that the Manufacturer Defendants require exclusivity on the part of their equipment dealers. (*Id.* ¶ 39). That is, when a dealer takes title to equipment manufactured by one of the Manufacturer Defendants, the dealer is expected not to deal with competing suppliers. (*Id.*). ICP alleges that these exclusivity requirements foreclose substantial portions of the dealer market to new entrants. (*Id.* ¶ 42).

Historically, direct sales of new heavy construction equipment to end users have been uncommon. (*Id.* ¶ 20). ICP sought to change that paradigm by selling foreign (particularly Chinese) heavy construction equipment directly to consumers through the use of the Internet. (*Id.* ¶¶ 69, 70, 74). ICP planned to use an online entity called IronPlanet to host and support their online store. (*Id.* ¶ 74). IronPlanet is the largest online marketplace for the sale of used heavy construction equipment. (*Id.* ¶¶ 56, 57, 58). ICP alleges that the Manufacturer Defendants are among the highest volume sellers of used heavy construction equipment on the IronPlanet platform. (*Id.* ¶ 94). Through its partnership with IronPlanet, ICP hoped to benefit from the substantial user base of end users already using IronPlanet to purchase used heavy construction equipment. (*Id.* ¶ 74). ICP alleges that although the Manufacturer Defendants had exclusivity agreements with dealers, the requirements imposed by the Manufacturer Defendants did not extend to the servicing of equipment. (*Id.* ¶¶ 75, 76). Therefore ICP was able to successfully enter into arrangements with dealers for maintenance and repair of equipment it distributed online. (*Id.*). With this new business model, ICP could be a "master distributor" for "low priced,

high-quality new heavy construction equipment" in a new and efficient distribution channel. (*Id.* ¶¶ 74, 76).

ICP announced its partnership with IronPlanet on March 3, 2014 at the CONEXPO-CON/AGG industry event. (*Id.* ¶ 82). This announcement was widely covered in the trade press and generated substantial interest, particularly from Chinese manufacturers seeking to enter into distribution deals with ICP. (*Id.* ¶¶ 82, 87, 88, 89, 90). ICP alleges that its entry into the market posed a significant competitive threat to the Manufacturer Defendants and that they, in response, conspired to block ICP's entry. (*Id.* ¶¶ 93, 94). ICP alleges that each of the Manufacturer Defendants communicated "the same or similar threat" to IronPlanet "within days of one another." (*Id.* ¶ 96). The thrust of the threat, ICP alleges, was that each Manufacturer Defendant would stop selling their used equipment through IronPlanet if IronPlanet continued to deal with ICP. (*Id.* ¶¶ 95, 96). IronPlanet then informed ICP that it would not perform under the terms of their agreement, and delivered a written notice of termination. (*Id.* ¶ 102).

ICP alleges that in furtherance of eliminating any potential threat to Caterpillar's business through the use of IronPlanet, Caterpillar sought to merge Cat Auction Services and IronPlanet. (*Id.* ¶¶ 105, 106). ICP alleges this merger was made possible because Caterpillar owned a minority stake in both companies. (*Id.* ¶ 105). This merger was effectuated by Caterpillar, ICP alleges, to align the goals of IronPlanet with those of Caterpillar, thus allowing Caterpillar to eliminate the threat of ICP or any other potential market entrants. (*Id.* ¶¶ 105, 106).

## II.    LEGAL STANDARD

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept the complaint's factual allegations as true, but may

disregard any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). There must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quotation marks omitted)).

## III. ANALYSIS

### A. Group Boycott Under Sherman Act § 1 (Counts One and Two)

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In order to satisfy the requirement of a "contract, combination . . . or conspiracy," there must be "some form of concerted action." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "The existence of an agreement is the hallmark of a Section 1 claim." *Id.*

In alleging the existence of such an agreement, the plaintiff must state "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Evidence of parallel conduct is, by itself, not sufficient to show an agreement. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). When

factual allegations of parallel conduct are set forth to satisfy the § 1 agreement requirement, the parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Parallel conduct can support an inference of agreement when it "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 556 n.4. The Third Circuit has advised courts to look to certain so-called "plus factors" to determine whether parallel conduct may give rise to an inference of agreement. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). While there is no exhaustive list of "plus factors," the Third Circuit has identified the following three: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id.* (quotation marks omitted). When "'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior," the complaint should be dismissed. *In re Ins. Brokerage*, 618 F.3d at 326.

In addition to demonstrating an agreement, the § 1 plaintiff must show that "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). While § 1 agreements are ordinarily analyzed under the "rule of reason," some agreements are *per se* unlawful once proven. *In re Ins. Brokerage*, 618 F.3d at 316. One such *per se* unlawful agreement is a group boycott, or a "concerted refusal[] by traders to deal with other traders." *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1988).

6

The Court must first determine which allegations of the complaint are factual, and thus entitled to a presumption of truth, and which are mere legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Here, the complaint's bare conclusory allegations of agreement—such as "[o]n information and belief, the Manufacturer Defendants agreed and conspired with one another to issue these threats" (D.I. 1 ¶ 98)—are to be disregarded in assessing the sufficiency of the complaint. *See Fowler*, 578 F.3d at 210-11.

As for the complaint's factual allegations, which must be accepted as true, there are no facts that directly show the existence of an agreement between the Manufacturer Defendants. ICP instead insists that the existence of an agreement can be inferred from the circumstances surrounding IronPlanet's failure to perform the terms of its agreement with ICP. (D.I. 40 at 20-22; D.I. 1 ¶¶ 81-86, 95-97, 100, 101). ICP "announced its partnership with IronPlanet on March 3, 2014." (D.I. 1 ¶ 82). ICP further alleges that "[e]ach of the Manufacturer Defendants communicated the same or similar threat to IronPlanet within days of one another," and that IronPlanet "contemporaneously communicated the fact and substance of these communications to ICP." (*Id.* ¶¶ 95, 96). Specifically, the complaint alleges that on April 3, 2014, the President of IronPlanet "informed ICP's Chairman that Caterpillar, and at least one other manufacturer of heavy construction equipment, had threatened to stop doing business with IronPlanet if IronPlanet continued to deal with ICP." (*Id.* ¶ 96). On April 10, 2014, in response to an inquiry about the identity of the other manufacturers, IronPlanet's President "replied 'you know who our investors are.'" (*Id.*). The complaint alleges that the investors in IronPlanet are the Manufacturer Defendants and venture capital firms. (*Id.* ¶ 97).

With all inferences drawn in favor of ICP, the complaint can be understood as alleging that each of the Manufacturer Defendants made similar threats to IronPlanet and that those

7

complaints were made "within days of one another." (*Id.* ¶ 95). The Court may infer that

because the Manufacturer Defendants were the sole manufacturer investors in IronPlanet, and

because the President of IronPlanet stated that "Caterpillar and at least one other manufacturer"

issued threats, all of the Manufacturer Defendants issued boycott threats.[1] (*Id.* ¶¶ 96, 97). This

parallel conduct, however—without more—does not suffice. *Twombly*, 550 U.S. at 557. Even

"'conscious parallelism' . . . is 'not in itself unlawful,'" as "parallel conduct is 'just as much in

line with a wide swath of rational and competitive business strategy unilaterally prompted by

common perceptions of the market.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321

(3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 553-54). ICP argues that it has alleged sufficient

additional "plus factor" facts to plausibly suggest the existence of an agreement, rather than

independent action. I disagree.

     ICP argues that the close temporal proximity of the threats, in conjunction with their

content, leads to an inference of agreement. The complaint does not, however, present a scenario

where threats were made within minutes or hours of one another. *See, e.g., Taxi Weekly, Inc. v.*

*Metro. Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 911 (2d Cir. 1976) (taxi fleet owners all

unexpectedly telephoned cancellations of long-standing subscriptions within a half-hour period).

Nor does the complaint present a scenario where the threats at issue were so specific or complex

that they could not be explained absent prior agreement. *See, e.g., Twombly*, 550 U.S. at 556 n.4

(noting with apparent approval that the parties agreed that "complex and historically

unprecedented changes in pricing structure made at the very same time by multiple competitors,

---

[1] This understanding may exceed what would be properly understood in viewing the allegations in the light most favorable to Plaintiff. Caterpillar was named by IronPlanet's President, but no one else was. It approaches speculation to infer from the cryptic remarks of IronPlanet's President that there was more than one other threat conveyed to IronPlanet, and there is no basis to choose between Komatsu and Volvo as the threatmaker if there was only one other threat.

and made for no other discernible reason, would support a plausible inference of conspiracy"
(quotation marks omitted)); *FTC v. Cement Inst.*, 333 U.S. 683, 713 n.15 (1948) (identical bids
were made by rivals on an item with no standard price). Instead, the factual allegations here are
entirely consistent with the Manufacturer Defendants reacting to a common stimulus: the recent
announcement of the ICP and IronPlanet partnership, an announcement made a month before the
threats, which occurred "within days of one another." (D.I. 1 ¶¶ 82, 95, 96). The timing of the
threats, as described in the complaint, does not suggest the contrary. Although ICP urges the
Court to interpret IronPlanet's "contemporaneous communicat[ions]" with ICP to mean that
several threats were issued on the same day, that reading is far too strained. (*Id.* ¶ 96; D.I. 44 at
20-22). The implausibility of this reading is particularly evident in light of the complaint's clear
statement that the threats were made days apart. (D.I. 1 ¶ 95).

Further, while the complaint concludes that the Manufacturer Defendants "communicated
the *same or similar threat* to IronPlanet," this particular boycott threat is not particularly
complex. (*Id.* (emphasis added)). It is hard to imagine a scenario where one refusal to deal—
under the circumstances described in the complaint—would not be "the same or similar" to
another. In the absence of facts setting out some unexplained or striking similarity, a general
assertion about the similarity of the threats is of little or no significance.

ICP argues that the because of the "costly and risky nature of [these] threats," no
Manufacturer Defendant "would have made [such threats] had it not had assurances that the
other Manufacturer Defendants would do the same." (D.I. 1 ¶¶ 99, 100; D.I. 36 at pp. 9-11).
These conclusory statements fail to find support in the facts set forth in the complaint. In fact,
ICP acknowledges that the Manufacturer Defendants individually wield powerful leverage over
IronPlanet. The complaint states: "IronPlanet has in the past publicly acknowledged the risks to

its revenues and profitability if *one or more* of the Manufacturer Defendants stopped selling their used heavy construction equipment through IronPlanet." (D.I. 1 ¶ 94 (emphasis added)). Therefore, the boycott threats issued to IronPlanet by each the Manufacturer Defendants are not "inconsistent with independent self-interest." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 730 (E.D. Pa. 2011). In response to the recent announcement of a new entrant that threatened to change the entire industry dynamic, one would expect the Manufacturer Defendants to make the same rational decision to the same stimulus: stop ICP's entry. (D.I. 36 at pp. 2-4; D.I. 38 at pp. 3-4). That seems to be the "obvious alternative explanation" for the conduct of the Manufacturer Defendants. *Twombly*, 550 U.S. at 567.

The purported interests of the Manufacturer Defendants, viewed together with the content and timing of the threats, do not suffice to plausibly suggest the existence of an agreement. That the complaint sets forth facts showing that an agreement was possible is not enough. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). To be actionable under § 1, the threats issued by the Manufacturer Defendants must have been predicated on an agreement, rather than independent self-interest. That necessary factual predicate is absent here. Therefore, Counts One and Two of the complaint are dismissed for failure to state a claim upon which relief could be granted.

**B.    Exclusive Dealing Under Clayton Act § 3 (Counts Three and Four)**

An exclusive dealing claim may be pursued under § 1 or § 2 of the Sherman Act, or § 3 of the Clayton Act. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184 (3d Cir. 2005); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir. 1992) ("All exclusive dealing agreements must comply with section 1 of the Sherman Act . . . .," while "[c]ontracts for the sale of goods . . . must also comply with the more rigorous standards of section 3 of the Clayton

10

Act."). "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). The "agreement" may be express or *de facto*. *Id.* Exclusive dealing agreements are not by themselves unlawful; indeed, they may be entered into for "entirely procompetitive reasons . . . and pose little threat to competition." *Id.* "Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason," where the legality of such an agreement "depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *Id.* at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). In short, the exclusion of competitors becomes actionable under the antitrust laws only when "it impairs the health of the competitive process itself." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 394 (7th Cir. 1984); *see also ZF Meritor*, 696 F.3d at 271, 281.

In conducting the rule of reason analysis, "courts consider not only the percentage of the market foreclosed, but also take into account the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *ZF Meritor*, 696 F.3d at 271 (quotation marks omitted). To state a claim, a plaintiff must generally show "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Id.* at 271-72 (internal citations omitted). Courts may also consider whether "the dominant firm engaged in coercive behavior, . . . the ability of customers to terminate the agreements," and "[t]he use of exclusive dealing by competitors." *Id.* at 272 (internal citations omitted). For present purposes, it should be noted that if "competitors can reach the ultimate consumers of the product by employing

11

existing or potential alternative channels of distribution, it is unclear whether such restrictions

foreclose from competition *any* part of the relevant market." *Omega Envtl., Inc. v. Gilbarco,*

*Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d

181, 195 (3d Cir. 2005) (acknowledging the need to "assess[]" the "overall significance to the

market" of "other avenues of distribution" in a Sherman Act § 2 exclusive dealing case).

     Here, the factual allegations pertaining to exclusive dealing arrangements are sparse.

(*See* D.I. 1 ¶¶ 40-42). ICP alleges that the Manufacturer Defendants impose "all or nothing"

terms on dealers. (*Id.* ¶ 40). Further, the complaint asserts that dealers are "slow to switch to

new entrants . . . because [the] exclusivity requirements effectively require new entrants to have

a nearly full-line in order to compete successfully for distribution." (*Id.*). The complaint goes on

to allege that "[b]arriers to entry at the . . . dealer level of the market are also high, . . . . [since]

[e]ntry . . . would require . . . access to a full line of heavy construction equipment[,] . . .

substantial investments in sales and service locations in any given territory, and . . . substantial

financing." (*Id.* ¶ 47). ICP concludes that, as a result of these exclusive dealing arrangements,

"substantial portions of the dealer market" are foreclosed. (*Id.* ¶ 42). The "foreclosure

percentages attributable to . . . [the Manufacturer Defendants' arrangements] is at least equal to

their market shares in relevant markets around the country," and "the exclusivity policies of the

Manufacturer Defendants and the largest of the domestic incumbent manufacturers foreclose

new entrants from 85 percent or more of dealers."[2] (*Id.*).

     These factual allegations fail to make out a *prima facie* case of exclusive dealing for at

least two independent reasons. First, ICP fails to adequately plead the lack of alternative

channels of distribution. Second, aside from this shortcoming, ICP does not sufficiently allege

---

[2] The term "domestic incumbent manufacturers" refers to "somebody who's currently a manufacturer," whether or not that manufacturer happens to be a defendant in this case. (D.I. 44 at 109).

12

substantial foreclosure of the relevant market.[3] These deficiencies are addressed separately below.

The complaint repeatedly acknowledges multiple alternative means of distribution. There are dealers "not tied up by . . . exclusivity requirements." (D.I. 1 ¶ 42). There are several online marketplaces, aside from IronPlanet.[4]  (*Id.* ¶ 65). ICP simply dismisses these alternatives as inferior. (D.I. 36 at p. 45). That may be, but the key consideration in an exclusive dealing claim is the harm to competition, not the "mere[] disadvantage" to a rival, arising from its inability to use its preferred distribution methods. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012); *see also Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 394 (7th Cir. 1984) ("The exclusion of one or even several competitors, for a short time or even a long time, is not *ipso facto* unreasonable."). ICP provides some factual allegations to support the conclusion that physical auctions are no substitute for online auctions. (D.I. 1 ¶¶ 62, 63). ICP also alleges that IronPlanet is the largest and most active online marketplace. (*Id.* ¶ 65). These factual allegations, however, do not plausibly suggest a lack of alternative distribution channels for ICP. ICP simply concludes—without any relevant factual support—that it is deprived of any "feasible way to reach consumers." (*Id.* ¶ 107; *see also* ¶¶ 2, 4, 109, 110; D.I. 36 at p. 45). That is not enough. *See, e.g., PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7-8 (N.D. Cal. Apr. 25, 2014).

---

[3] The parties agree that the exclusive dealing allegations may be characterized as three separate cases, one against each of the Manufacturer Defendants. (D.I. 44 at 44, 46). For purposes of showing substantial foreclosure, ICP argues that the effects of each exclusive dealing arrangement can be aggregated under principles established in *Standard Oil Co. v. United States*, 337 U.S. 293 (1949). (D.I. 36 at p. 40; D.I. 44 at 46).

[4] ICP contends that since the Manufacturer Defendants have prevented them from using IronPlanet, there are no alternative means of distribution left. For purposes of this motion, the Court assumes, without deciding, that ICP's inability to use IronPlanet precludes the consideration of IronPlanet as an alternative distribution method.

ICP's cited cases are distinguishable. The complaint does not lay out any facts that show a dominant firm barred competitors from entire modes of distribution, or from nearly all cost-effective means of distribution. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005); *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001). Instead, the complaint actually suggests that there are several viable alternative means of distribution. Recently, Chinese manufacturers SANY and LiuGong were able to enter the market by establishing their own dealerships. (*Id.* ¶¶ 45, 76); *see Roland*, 749 F.2d at 394 (holding that Komatsu's successful entry into the market, despite the "nationwide practice of exclusive dealing," tended to negate the plaintiff's claim of substantial foreclosure). SANY has been "able to reach approximately 5 percent of the U.S. market,"[5] and both SANY and LiuGong are now profitable. (*Id.* ¶¶ 45, 76). Further, the existence of IronPlanet itself demonstrates that "users of heavy construction equipment will purchase such equipment outside of longstanding channels of distribution." (D.I. 36 at p. 2). The complaint advances no facts and provides no theory as to how the large user base of an online auctioneer for used equipment renders it the sole avenue for direct sales of new equipment over the Internet. Accordingly, ICP has not adequately alleged facts showing the absence of alternative channels of distribution. *See PNY Techs.*, 2014 WL 1677521, at *8.

Aside from ICP's failure to plead a lack of alternative distribution channels, it fails to demonstrate that the Manufacturer Defendants' exclusive dealing arrangements amount to substantial foreclosure in any alleged market at all. The complaint generally states that the

---

[5] It is not entirely clear what ICP means by this. From the context of the complaint, I take it to mean that SANY products are available for purchase in 5% of the nationwide market for new heavy construction equipment. While this may indicate that using IronPlanet would permit a seller to reach more of the market (as ICP states in the preceding sentence that "[t]hrough IronPlanet, ICP would reach approximately 80 percent of end users"), it does not indicate that SANY has been unable to establish its own alternative means of distribution. (*See id.* ¶ 76).

14

Manufacturer Defendants have exclusive dealing arrangements with dealers, and therefore, new entrants are "unable to compete successfully for distribution." (D.I. 1 ¶¶ 40, 44). Further, ICP alleges that this "imposition of exclusivity . . . is coercive and contrary to the preference of the dealers." (*Id.* ¶ 41). These are mere conclusions. ICP does, however, allege some facts for its assertion that existing dealers may have difficulty switching to new manufacturers and that entry is difficult for new dealers, but that is not enough. (*Id.* ¶¶ 40, 46, 47).

Since ICP alleges no facts about the nature of the exclusive dealing arrangements and their potentially anticompetitive effects, the Court cannot assess, as part of the *prima facie* case, whether the arrangements could suppress competition or not. In the rule of reason analysis of exclusive dealing arrangements, courts consider "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects," as well as the existence of coercion, "the ability of customers to terminate the agreements, . . . [and] [t]he use of exclusive dealing by competitors." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012). Aside from allegations that all Manufacturer Defendants engage in exclusive dealing, and that there are risks and costs associated with dealerships switching suppliers, ICP has provided almost no factual basis upon which the court could consider the practical effects of the exclusive dealing arrangements. *Compare, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 325-35 (1961) (rule of reason analysis); *ZF Meritor*, 696 F.3d at 286-90 (same), *with PNY Techs.*, 2014 WL 1677521, at *4-5 (finding that there were inadequate facts to determine whether there was unlawful foreclosure); *Pro Search Plus, LLC v. VFM Leonard, Inc.*, 2013 WL 3936394, at *2-4 (C.D. Cal. July 30, 2013) (same). ICP need not prove its case in the complaint, but it must allege facts

sufficient to "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). It has not done so here. The Court cannot simply hypothesize that some set of facts could support a basis for relief to be granted. *See Twombly*, 550 U.S. at 562-63. Indeed, "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Id.* at 558 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

The complaint fails to make out a *prima facie* case of exclusive dealing sufficient to survive Defendants' motion to dismiss. The thrust of ICP's allegations is that the Manufacturer Defendants each have exclusive dealing arrangements with their respective dealers. This is not by itself actionable, as many industries function in such a fashion for entirely procompetitive reasons. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 440-41 (3d Cir. 1997); *see also ZF Meritor*, 696 F.3d at 270. There must be harm to the competitive process itself. *ZF Meritor*, 696 F.3d at 271, 281. Since ICP has failed to adequately plead substantial foreclosure and a lack of alternative channels of distribution, its exclusive dealing claim cannot be sustained. Therefore, Counts Three and Four of the complaint are dismissed.

**C.    Monopolization, Attempted Monopolization, and Conspiracy to Monopolize Under Sherman Act § 2 (Counts Five, Six, Seven, and Eight)**

ICP alleges three types of § 2 monopoly claims in its complaint: monopolization, attempted monopolization, and conspiracy to monopolize. (D.I. 1 ¶¶ 125, 127, 129, 131). The monopolization and attempted monopolization claims (Counts Five and Six) are directed solely at Caterpillar, while the conspiracy to monopolize claims (Counts Seven and Eight) are alleged against all of the Manufacturer Defendants and AAS. (*Id.*). The three types of monopoly claims are addressed separately below.

16

*1. Monopolization*

To state a claim for monopolization, the plaintiff must plead "(1) the possession of

monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-

07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

"Monopoly power is the ability to control prices or exclude competition in a given

market." *Grinnell*, 384 U.S. at 571. Monopoly power may be inferred from a firm's "possession

of a dominant share of a relevant market that is protected by entry barriers." *Harrison Aire, Inc.

v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) (quoting *United States v. Microsoft

Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)). "Plaintiffs relying on market share as a proxy for

monopoly power must plead and produce evidence of a relevant product market, of the alleged

monopolist's dominant share of the market, and of high barriers to entry." *Id.* Barriers to entry

include "regulatory requirements, high capital costs, or technological obstacles, that prevent new

competition from entering a market in response to a monopolist's supracompetitive prices."

*Broadcom*, 501 F.3d at 307. The Third Circuit has held that "[a]s a matter of law, absent other

relevant factors, a 55 percent market share will not prove the existence of monopoly power," and

further, that a "significantly larger market share than 55 percent has been required to demonstrate

*prima facie* monopoly power." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 201-02 (3d

Cir. 1992). In fact, "courts virtually never find monopoly power when market share is less than

about 50 percent." ABA Section of Antitrust Law, *Antitrust Law Developments* 231-32 (6th ed.

2007).

Plaintiffs must plead a relevant market in which monopoly power exists. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 2007). The boundaries of the relevant market "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v United States*, 370 U.S. 294, 325 (1962). Products are considered reasonably interchangeable if "one product is roughly equivalent to another for the use to which it is put." *Queen City Pizza*, 124 F.3d at 437. When a plaintiff fails to properly define "its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, . . . the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* at 436.

In addition to market power, the monopolization plaintiff must show "an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). This conduct "comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* 78 (1978)). The Third Circuit has held that "there must be proof that competition, and not merely competitors, has been harmed." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005).

ICP's allegations of monopoly power, to the extent they exist at all, consist almost entirely of threadbare conclusions. The complaint concludes that "Caterpillar has substantial market power in the relevant heavy construction equipment market as a whole [and] monopoly power within certain of the relevant heavy construction equipment markets within certain local geographic markets." (D.I. 1 ¶ 51). The factual support for this conclusion is as follows. The

18

complaint alleges that Caterpillar "accounts for approximately 40 percent or more of all sales of new heavy construction equipment in the United States." (*Id.* ¶ 21). ICP further alleges that the exclusive dealing arrangements between manufacturers and local dealers, together with the substantial initial investments associated with entering the dealer market, constitute barriers to entry. (*Id.* ¶¶ 39-50). The complaint also alleges that the merger between AAS and IronPlanet is "anticompetitive." (*Id.* ¶¶ 111).

The complaint both fails to allege a relevant market and to plausibly suggest monopoly power. As to the former, ICP attempts to rely on several "submarkets" to meet its burden of pleading a relevant market for purposes of showing monopoly power: "[t]he relevant markets in which to evaluate Defendants' conduct are the sale of specific types of new heavy construction equipment (*e.g.*, backhoes) in local geographic markets around the country (*e.g.*, California), and in any event are no broader than the sale of all types of new heavy construction equipment in the United States." (D.I. 36 at p. 22; D.I. 1 ¶¶ 33-38). The complaint, however, alleges that ICP and the Manufacturer Defendants (including Caterpillar) compete nationally. (D.I. 1 ¶¶ 8-10, 19-21, 37, 56-57, 69, 76, 85). ICP must support its allegations of smaller, state-specific relevant markets with factual allegations. ICP cannot simply gerrymander markets, without supporting facts, where it deems it advantageous. *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 330-32 (1961); *E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 688 F. Supp. 2d 443, 456-57 (E.D. Va. 2009); *Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 403-04 (D. Del 2009).

ICP's attempt to slice up heavy construction equipment into individual equipment-specific markets fails for similar reasons. ICP provides no facts for its equipment-specific markets, instead simply concluding that "[t]he closest substitutes for each type of new heavy

19

construction equipment is used heavy construction equipment of that type." (D.I. 1 ¶ 35). This

conclusion (which seems plausible to me) does nothing to explain how the various types of

construction equipment differ from one another, however. While "the 'market' for antitrust

purposes is the *one* relevant to the particular legal issue at hand," 2B Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law* 266 (4th ed. 2014), it is possible that Caterpillar possesses monopoly

power in more than one market. If segments of a market are prone to prices being raised above

competitive levels, "those segments would be proper topics of antitrust concern not because they

are submarkets, but because they would be relevant product markets in their own right." *Id.* at

271 (quoting *In re Owens-Illinois, Inc.*, 115 F.T.C. 179, 298 (1992)); *see also Geneva Pharms.*

*Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). The complaint advances no

facts that define these markets "with reference to the rule of reasonable interchangeability and

cross elasticity of demand." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436

(3d Cir. 2007). Therefore, these submarkets cannot constitute the relevant markets for ICP's

monopolization claim.

Even assuming a market was properly alleged, ICP fails to adequately plead monopoly

power on the part of Caterpillar. The complaint alleges that Caterpillar has "substantial market

power," engages in "oligopoly pricing," and possesses a market share of "approximately 40

percent or more." (D.I. 1 ¶¶ 21, 49, 51). ICP's claim fails on its face. An allegation of 40

percent market share does not suffice to show monopoly power. *See, e.g.*, *Fineman v. Armstrong*

*World Indus.*, 980 F.2d 171, 201-02 (3d Cir. 1992). Aside from the allegation of market share,

ICP has alleged no facts plausibly suggesting that Caterpillar has monopoly power. *See Rebel*

*Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1442-43 (9th Cir. 1995) (holding that oligopoly

pricing does not show market power sufficient to cause antitrust concern and that "one firm *alone* must have the power to control market output and exclude competition").

ICP's complaint fails to allege the requisite facts to plausibly suggest monopoly power in a relevant market. Therefore, Counts Five and Six fail to state a claim for monopolization.

### 2. Attempted Monopolization

To state a claim for attempted monopolization, the plaintiff must plead "(1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power." *W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010). In assessing whether a defendant has a dangerous probability of achieving monopoly power, the court should examine factors other than the size of the defendant's market share, including "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).

Like ICP's claim for monopolization, the complaint is almost entirely bereft of any factual allegations supporting its claim for attempted monopolization. The allegations upon which ICP relies are identical to those it relies on for its monopolization claim. With the same facts and a similar claim, the result is the same.

One of the major distinctions between attempted monopolization and monopolization is that the latter requires a showing that, despite not being a monopoly, a firm possesses a "dangerous probability of achieving monopoly power" and has a "specific intent to monopolize." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010). The complaint is devoid of any factual allegations that satisfy either of these elements.

Therefore, Counts Five and Six also fail to state a claim for § 2 attempt to monopolize. Since both the monopolization and attempt to monopolize theories cannot be maintained, Counts Five and Six of the complaint are dismissed.

### 3. Conspiracy to Monopolize

To state a claim for conspiracy to monopolize, the plaintiff must plead: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). For present purposes, it should be noted that § 2 "applies to the conduct of single firms only, rather than to the conduct of a small number of firms engaged in tacit collusion, as in cases involving oligopoly, shared monopoly, or . . . duopoly." *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys, Inc.*, 249 F. Supp. 2d 622, 649 (E.D. Pa. 2003); *see also Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (District courts "have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act." (collecting cases)); ABA Section of Antitrust Law, *Antitrust Law Developments* 322-23 (6th ed. 2007) ("Even where competitors allegedly have conspired to monopolize the market, the traditional view has been that the offense of monopolization requires that a single firm possess monopoly power.").

ICP fails to allege any facts which could give rise to a plausible inference of conspiracy to monopolize. In its opposition to this motion, ICP references the portions of the complaint pertaining to the group boycott. (D.I. 36 at p. 53; D.I. 1 ¶¶ 93-107). As indicated above, the only type of actionable conspiracy to monopolize necessarily involves a single firm monopoly, *i.e.*, a conspiracy to make Caterpillar a monopoly. *See Arista Records*, 532 F. Supp. 2d at 580.

Quite simply, there are no factual allegations concerning an agreement to create a single dominant firm. Even assuming the group boycott allegations were sufficient to plausibly suggest a conspiracy of any sort, they do not, under these circumstances, satisfy the requirements of a § 2 conspiracy to monopolize.

The allegations of conspiracy must be supported by factual allegations. *Howard Hess*, 602 F.3d at 255. ICP advances no facts beyond its assertion that the Manufacturer Defendants sought to exclude ICP from the market through the use of a group boycott. This does not suffice. Therefore, Counts Seven and Eight of the complaint are dismissed for failure to state a claim upon which relief can be granted.

**D.    Unlawful Merger Under Sherman Act § 1 and Clayton Act § 7 (Counts Nine and Ten)**

Section 7 of the Clayton Act prohibits mergers the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The plaintiff must properly allege a market wherein the injury to competition occurs. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (The "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition."). To state a claim, the harm to competition cannot be speculative. Instead, there must be "a threat of antitrust injury which produces directly harmful effects that are closely related to the violation." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007) (quotation marks omitted). "[I]njury . . . will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *Atl. Richfield Co. v.*

*USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Thus, the "[f]ailure to allege actionable

anticompetitive conduct forecloses further judicial inquiry." *Broadcom*, 501 F.3d at 321.

It is difficult to comprehend the nature of ICP's claim for unlawful merger. The entirety

of ICP's claim appears to be that the merger of AAS with IronPlanet effectively amounted to

AAS joining an ongoing conspiracy between the Manufacturer Defendants "to eliminate the

threat of ICP's entry through IronPlanet." (D.I. 1 ¶ 106). ICP explains that by taking control of

IronPlanet through AAS, Caterpillar and the other Manufacturer Defendants could ensure that

the possibility of a future competitive threat, like ICP, would be eliminated. (*Id.* ¶¶ 105-107).

Put another way, ICP attempts to allege a vertical merger between Caterpillar and AAS. (D.I. 36

at pp. 55-56). This conclusion is premised on ICP's contentions that Caterpillar and the other

Manufacturer Defendants are somehow acting through AAS, and that IronPlanet and ICP operate

in the same market. (D.I. 1 ¶ 63, 64, 107).

ICP's vertical merger theory does not state a claim. The complaint does not allege a

merger of Caterpillar (a manufacturer) and IronPlanet (an auctioneering service). The complaint

instead refers to a horizontal merger between two auctioneering services, AAS and IronPlanet.

(*Id.* ¶¶ 1, 5, 105, 106, 111, 133, 135). The vertical merger theory proposed by ICP hinges on the

assumption that Caterpillar and AAS are interchangeable. The complaint, however, concedes

that "Caterpillar is a shareholder in Cat Auction Services, along with more than twenty

Caterpillar equipment dealers," and further, that "Caterpillar holds minority stakes" in both

IronPlanet and AAS. (*Id.* ¶¶ 11, 105). ICP supplies no explanation as to how Caterpillar, let

alone the other Manufacturer Defendants, could be deemed to have vertically merged with

IronPlanet. Since ICP's unlawful merger claim depends on a vertical merger theory that cannot

be sustained, it fails.

Even if the Court were to accept ICP's theory that AAS is some sort of alter ego of Caterpillar, the complaint fails to explain how any of the allegations give rise to any anticompetitive concern. The alleged market for ICP is the market for new heavy construction equipment. (D.I. 1 ¶¶ 105, 106, 133-36). The complaint does not explain how the merger of AAS and IronPlanet—both entities which operate in the market for used heavy construction equipment— substantially lessens competition in the market for new heavy construction equipment.

ICP's cited cases are inapposite. (D.I. 44 at 93-94, 105-06); *see, e.g., AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 574-75 (7th Cir. 1999); *HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1114 (S.D. Miss. 1997). In *AlliedSignal*, B.F. Goodrich (a manufacturer of several components of aircraft landing systems: landing gear, wheels, and brakes) sought to merge with Coltec (a manufacturer of landing gear). *AlliedSignal*, 183 F.3d at 570. AlliedSignal (a manufacturer of wheels and brakes) alleged that the merger would substantially lessen competition in the landing gear market, which would harm AlliedSignal in its capacity as a *purchaser* of landing gear. *Id.* at 571, 574. In *HTI Health*, the plaintiff sought to halt the merger between two large physician clinics and a large hospital. *HTI Health*, 960 F. Supp. at 1107. The plaintiff hospital alleged that the inpatient hospital services market, a market in which the plaintiff and the defendant hospital participated, would be harmed because clinic physicians, as future shareholders in the merged entity, would "have a financial incentive . . . to send their patients to" the hospital belonging to the merged entity. *Id.* at 1114. The court found this to be sufficient antitrust injury. *Id.* These cases, along with others cited by the parties, stand for the proposition that the merger must have the effect of harming competition in the alleged market in which the plaintiff participates. *United States v. E. I. du Pont de Nemours & Co.*, 353

25

U.S. 586, 593 (1957). ICP has made no allegations as to how the merger of two auctioneers for used heavy construction equipment lessens competition in the market for new heavy construction equipment.

For the aforementioned reasons, I find that ICP has failed to state a claim for unlawful merger. Therefore, Counts Nine and Ten are dismissed.

**E.    Related State Law Claims**

The basis for the court's subject matter jurisdiction over ICP's state law claims is the supplemental jurisdiction conferred by 28 U.S.C. § 1367. (D.I. 1 ¶ 15). A court "may decline to exercise supplemental jurisdiction" when the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A court should not exercise its supplemental jurisdiction in such circumstances unless "judicial economy, convenience, and fairness" require it. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 286 (3d Cir. 2006).

This case is still in its early stages, having not proceeded beyond the motion to dismiss stage. Accordingly, the Court sees no need to exercise its supplemental jurisdiction over ICP's state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Therefore, since the Court has no jurisdiction over the state law claims, Counts Eleven through Eighteen are dismissed.

**F.    Prejudice**

A dismissal under Fed. R. Civ. P. 12(b)(6) is a "judgment on merits" and is therefore ordinarily presumed to be with prejudice. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981). At oral argument, counsel for ICP requested that if the complaint were dismissed on the grounds that it "lack[ed] specificity," then ICP should be given "the ability to amend." (D.I. 44 at 107). The phrasing of this request informs the Court's decision with respect

to whether the claims should be dismissed with or without prejudice. The monopoly and unlawful merger claims are defective on their face. Since no facts alleged in good faith could survive a motion to dismiss, the counts relating to these claims (Five, Six, Seven, Eight, Nine, and Ten) are dismissed with prejudice. As for the group boycott and exclusive dealing claims, I am not convinced that any amendment brought by Plaintiff would necessarily be futile. The factual pleading may fall short of stating a claim, but it does not appear from the face of the claims that the legal theory is clearly without merit. Therefore, the counts pertaining to these claims (One, Two, Three, and Four) are dismissed without prejudice.

The Court is confident that if Plaintiff seeks to amend its complaint, it "will do so only in good faith and allege facts that [it] believe[s] [it] can prove." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 315 (3d Cir. 2011). The Court is not sure, however, what facts Plaintiff may be able to allege, or indeed, whether Plaintiff will stand on its complaint as written. Therefore, Plaintiff is given leave to amend its group boycott and exclusive dealing claims. If Plaintiff does not so amend, the dismissal without prejudice of these four counts will be converted into a dismissal with prejudice.

The state law claims are dismissed for lack of subject matter jurisdiction. Accordingly, their dismissal is without prejudice. *See Thompson v. Cty. of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994).

## IV.    CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss (D.I. 27, 28, 30, 33) are **GRANTED**. An appropriate order will be entered.