IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS LLC,

               Plaintiff;

    v.

CATERPILLAR INC., KOMATSU
AMERICA CORP., VOLVO
CONSTRUCTION EQUIPMENT NORTH
AMERICA, LLC and ASSOCIATED
AUCTION SERVICES, LLC d/b/a CAT
AUCTION SERVICES,

               Defendants.

Civil Action No. 15-108-RGA

## MEMORANDUM OPINION

John W. Shaw, Esq., Shaw Keller LLP, Wilmington, DE; David Boies, Esq., Boies, Schiller & Flexner LLP, Armonk, NY; James P. Denvir, Esq., Christopher G. Renner, Esq. (argued), Boies, Schiller & Flexner LLP, Washington, DC, attorneys for Plaintiff International Construction Products LLC.

David J. Baldwin, Esq., Janine L. Hochberg, Esq., Potter, Anderson & Corroon LLP, Wilmington, DE; Robert J. Brookhiser, Jr., Esq. (argued), Robert G. Abrams, Esq., Gregory J. Commins, Jr., Esq., Danyll W. Foix, Esq., Baker & Hostetler LLP, Washington, DC, attorneys for Defendant Caterpillar Inc.

M. Duncan Grant, Esq., James H. S. Levine, Esq., Pepper Hamilton LLP, Wilmington, DE; Jeremy Heep, Esq. (argued), Robin P. Sumner, Esq., Melissa Hatch O'Donnell, Esq., Pepper Hamilton LLP, Philadelphia, PA, attorneys for Defendant Volvo Construction Equipment North America, LLC.

Denise S. Kraft, Esq., Brian Biggs, Esq., DLA Piper LLP (US), Wilmington, DE; David H. Bamberger, Esq. (argued), Katherine M. Ruffing, Esq., James F. Reardon, Esq., DLA Piper LLP (US), Washington, DC, attorneys for Defendant Komatsu America Corp.

Henry E. Gallagher, Jr., Esq., Connolly Gallagher LLP, Wilmington, DE; Quentin R. Wittrock, Esq. (argued), Gray Plant Mooty, Minneapolis, MN, attorneys for Defendant Associated Auction Services LLC d/b/a Cat Auction Services.

August 22, 2016

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is International Construction Products LLC's ("ICP") motion for reconsideration and leave to amend, and Defendants' motion to dismiss. (D.I. 49, 54). ICP seeks reconsideration of the Court's dismissal with prejudice of certain claims in ICP's initial complaint. (D.I. 49). ICP also seeks leave to amend those claims. (*Id.*). Defendants move to dismiss ICP's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (D.I. 54). The issues have been fully briefed. (D.I. 50, 55, 58, 59). Oral argument was held on June 23, 2016. (D.I. 63). For the reasons set forth herein, the motion for reconsideration and leave to amend is **DENIED**, and the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

On January 29, 2015, ICP brought this antitrust action against Caterpillar, Volvo, Komatsu, and Associated Auction Services, LLC ("AAS"). (D.I. 1). ICP imports and sells heavy construction equipment. (D.I. 48 ¶ 7). Caterpillar, Volvo, and Komatsu (the "Manufacturer Defendants") manufacture heavy construction equipment. (*Id.* ¶¶ 8-10). AAS facilitates auctions for used heavy construction equipment. (*Id.* ¶ 11). ICP alleges violations of the Sherman Act, the Clayton Act, and state law. (*Id.* ¶¶ 113-52).

On January 21, 2016, the Court dismissed Counts One through Four and Eleven through Eighteen of ICP's complaint without prejudice, and dismissed Counts Five through Ten with prejudice. (D.I. 46). Counts One through Four related to group boycott and exclusive dealing. (D.I. 1). Counts Five through Ten related to monopolization, attempted monopolization, conspiracy to monopolize, and unlawful merger. (*Id.*). Counts Eleven through Eighteen were state law claims. (*Id.*). ICP filed the Amended Complaint on February 4, 2016, reasserting four federal law claims for group boycott and exclusive dealing, and eight state law claims. (D.I. 48).

At the same time, ICP moved for reconsideration and leave to amend, seeking to assert claims for monopolization, attempted monopolization, and unlawful merger. (D.I. 49). Defendants, on March 3, 2016, moved to dismiss the Amended Complaint. (D.I. 54). This opinion presumes knowledge of the Court's previous opinion. (D.I. 45).

## II.   LEGAL STANDARD

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept the complaint's factual allegations as true, but may disregard any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). There must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quotation marks omitted)).

Motions for reconsideration are the "functional equivalent" of motions to alter or amend the judgment under Fed. R. Civ. P. 59(e). *See Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1352 (3d Cir. 1990). The movant must show at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not [previously]

available . . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Motions for reargument or reconsideration "should only be granted sparingly and should not be used to rehash arguments already briefed." *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 419 (D. Del. 1999).

## III.   ANALYSIS

### A.   Motion to Dismiss Group Boycott Under Sherman Act § 1 (Counts One and Two)

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In order to satisfy the requirement of a "contract, combination . . . or conspiracy," there must be "some form of concerted action." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "The existence of an agreement is the hallmark of a Section 1 claim." *Id.*

In alleging the existence of such an agreement, the plaintiff must state "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Evidence of parallel conduct is not, by itself, sufficient to show an agreement. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). When factual allegations of parallel conduct are set forth to satisfy the § 1 agreement requirement, the parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Parallel conduct can support an inference of agreement when it "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 556 n.4 (quoting 6 Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law* ¶ 1425 (2d ed. 2003)). The Third Circuit has advised courts to look to certain so-called "plus factors" to determine whether parallel conduct may give rise to an inference of agreement. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). While there is no exhaustive list of "plus factors," the Third Circuit has identified the following three: "(1) evidence that the defendant had a motive to enter into a . . . conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id.* (quotation marks omitted). While plus factors are also relevant at the summary judgment stage, "courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015), *cert. denied*, 2016 WL 345148 (June 20, 2016). "[T]he motion-to-dismiss stage concerns an 'antecedent question.'" *Id.* (quoting *Twombly*, 550 U.S. at 554); *see also In re Ins. Brokerage*, 618 F.3d at 322, 323 n.21. In addressing that antecedent question, courts should keep in mind that "[t]he 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment." *Starr v. Sony BMG Music Entmt.*, 592 F.3d 314, 325 (2d Cir. 2010) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d1 (3d ed. 2007)).

In other words, to survive a motion dismiss, plaintiffs must establish "something more than merely parallel behavior." *Twombly*, 550 U.S. at 560. In the Third Circuit, "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor.'" *In re Ins. Brokerage*, 618 F.3d at 323. When "'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior," the complaint should be dismissed. *Id.* at 326.

The Court previously dismissed ICP's group boycott claim for failing to allege facts which plausibly suggested the existence of an agreement. ICP's original complaint was vague and conclusory, so it was difficult to draw any inferences from the nature or timing of the threats at issue. In the Amended Complaint, ICP has clearly alleged parallel conduct by the Manufacturer Defendants. Thus, the only question now before the Court is whether ICP has alleged facts sufficient to establish at least one plus factor. I conclude that it has.

The Amended Complaint indicates that "[e]ach of the Manufacturer Defendants communicated the same or similar threat to IronPlanet within days of one another (and in at least two cases, on the same day)." (D.I. 48 ¶ 100). Further, ICP alleges that two of the threats were made "exactly 31 days after ICP's public announcement of market entry." (*Id.*). That is, on April 3, 2014—31 days after ICP's announcement of its partnership with IronPlanet— IronPlanet's President informed ICP's Chairman that "Caterpillar, and at least one other manufacturer of heavy construction equipment, had earlier that day threatened to stop doing business with IronPlanet if IronPlanet continued to deal with ICP." (*Id.* ¶ 101). A week later, IronPlanet's President informed ICP that "'other manufacturers' besides Caterpillar had made the same boycott threat." (*Id.*). When asked the identity of these threatmakers, "Iron Planet's President responded 'you know who our investors are.'" (*Id.*). ICP alleges that the Manufacturer Defendants "are the only manufacturer investors in Iron Planet." (*Id.*).

The parties dispute whether the threats made by the Manufacturer Defendants were actions against self-interest, as contemplated by the second plus factor. ICP alleges that, by threatening to withhold used equipment sales from IronPlanet, the Manufacturer Defendants— absent an agreement—risked lost sales. (*Id.* ¶ 105). Therefore, ICP argues, the parallel threats were actions against self-interest. Defendants maintain that, since the Manufacturer Defendants

individually wielded such strong leverage over IronPlanet, the threats were not risky at all. The court in *In re Pool Products Distribution Market Antitrust Litigation*, 988 F. Supp. 2d 696 (E.D. La. 2013), *appeal filed*, No. 16-30885 (5th Cir. Aug. 2, 2016), confronted a similar situation. There, the plaintiffs alleged that manufacturers of pool products had conspired with each other to raise prices. *Id.* at 712. The plaintiffs argued that, "[a]bsent parallel action by the other Manufacturer Defendants, such an increase in prices on the part of one manufacturer would risk a loss of market share to the other manufacturers." *Id.* at 712-13. The plaintiffs' allegations, however, could also be read to "suggest that [a large distributor's] leverage over the Manufacturing Defendants was so substantial that each Manufacturer Defendant might have complied with [the distributor's] demands [to raise prices] even without assurance of similar action by other manufacturers." *Id.* at 713. The court denied the motion to dismiss, holding that the complaint "plausibly allege[d] that [the] parallel conduct was contrary to [the defendants'] independent self-interest." *Id.* at 712. The court concluded that, so long as the plaintiffs' theory was plausible, the complaint should survive dismissal. *Id.* at 713; *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000) (holding that, under the substantial evidence standard, FTC's inference of a group boycott was not made implausible by the defendant's competing theory about each manufacturer's independent interests). The Third Circuit reached a similar conclusion when analyzing, in the post-trial context, the element of coercion in an exclusive dealing case. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 285 n.17 (3d Cir. 2012) ("[E]ven assuming that the evidence could support a conclusion that the [defendants] had more power in the relationship, the fact that two reasonable conclusions could be drawn from the evidence [did] not make . . . Plaintiffs' view unreasonable.").

"[T]he Court must accept the plaintiff's version of events, so long as that version is plausible, and it may not dismiss the complaint 'merely because [it] finds a different version more plausible.'" *Pool Products*, 988 F. Supp. 2d at 713 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 580 F.3d 162, 185 (2d Cir. 2012)).   The Amended Complaint could be read to infer that each Manufacturer Defendant independently held sufficient power to influence IronPlanet on its own.  That possible inference does not, however, make implausible ICP's inference that these were actions against self-interest.  *Twombly* and *Iqbal* do not require a court, at the motion-to-dismiss stage, to weigh competing inferences.  Since the Amended Complaint supports an inference that the Manufacturer Defendants undertook actions that may have been against their self-interest, this plus factor is satisfied.

While the Third Circuit requires only that a plaintiff establish one plus factor at the motion-to-dismiss stage, ICP has alleged more.  *See In re Ins. Brokerage*, 618 F.3d at 323.  ICP has described a scenario where the Manufacturer Defendants had a motive to conspire.  If all the Manufacturer Defendants agreed to issue a boycott threat to IronPlanet, they would all benefit from "excluding" ICP from the relevant new heavy construction equipment markets.  (D.I. 48 ¶ 105).  ICP's allegations fulfill the first plus factor.

The Amended Complaint also contains factual allegations implying a traditional conspiracy, as required by the third plus factor.  The Amended Complaint specifically alleges that the Manufacturer Defendants all made the same threat, and that those threats were made at roughly the same time.[1]  (*Id.* ¶ 100-01).  Notably, the Manufacturer Defendants all employed the same means to exclude ICP from the market.  This may be suggestive of conspiracy.  *See SD3*, 801 F.3d at 428 (recognizing that "red flags would be raised" if "the manufacturers agreed on a

---

[1] The previous opinion concluded that the timing and nature of the threats was not suggestive of a preceding agreement.  I think that ICP's clarifying allegations warrant a different conclusion.

common manner of preventing [a plaintiff's] entry into the market"). Further, "[s]imultaneous parallel action that is not a plausible coincidence or an expectable response to a common business problem" is suggestive of conspiracy. 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1425c (3d ed. 2010) (emphasis omitted). "'Simultaneous' . . . is not limited to events occurring at a single moment." *Id.* For instance, "[r]ivals' responses at different times to a customer's request are simultaneous if each would not normally know the content of another's response." *Id.* Here, although there was a common stimulus—i.e., ICP's attempted entry into the market—the Manufacturer Defendants each chose to make the same threat at the same time, without there appearing to be any legitimate reason why each would have knowledge of the other's actions. While conspiracy is not the only explanation for this simultaneous conduct, it is a plausible one.

ICP has alleged more than mere parallel behavior. The Amended Complaint includes the "something more" required by *Twombly*. Therefore, Defendants' motion to dismiss is denied with respect to ICP's group boycott claim.

**B.    Motion to Dismiss Exclusive Dealing Under Sherman Act § 1 (Counts One and Two) and Clayton Act § 3 (Counts Three and Four)**

An exclusive dealing claim may be pursued under § 1 or § 2 of the Sherman Act, or § 3 of the Clayton Act. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184 (3d Cir. 2005); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir. 1992) ("All exclusive dealing agreements must comply with section 1 of the Sherman Act . . . .," while "[c]ontracts for the sale of goods . . . must also comply with the more rigorous standards of section 3 of the Clayton Act."). "Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason," where the legality of such an agreement "depends on whether it will foreclose competition in such a substantial share of the relevant market so as to

adversely affect competition." *ZF Meritor*, 696 F.3d at 271. "To plausibly state a claim for

exclusive dealing subject to the rule of reason, plaintiffs must plead: 1.) the relevant product

market; 2.) the relevant geographic market and 3.) that the contract forecloses a substantial share

of the competition in the relevant product and geographic markets." *Xtreme Caged Combat v.

Cage Fury Fighting Championships*, 2015 WL 3444274, at \*6 (E.D. Pa. May 29, 2015).

Although "[t]here is no set formula for evaluating the legality of an exclusive dealing

agreement" pursuant to the rule of reason, courts in the Third Circuit generally require "a

showing of significant market power by the defendant, substantial foreclosure, contracts of

sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or

actual anticompetitive effects considered in light of any procompetitive effects." *ZF Meritor*,

696 F.3d at 271-72 (internal citations omitted). Courts may also consider whether "the dominant

firm engaged in coercive behavior, . . . the ability of customers to terminate the agreements," and

"[t]he use of exclusive dealing by competitors." *Id.* at 272 (internal citations omitted). For

present purposes, it should be noted that if "competitors can reach the ultimate consumers of the

product by employing existing or potential alternative channels of distribution, it is unclear

whether such restrictions foreclose from competition *any* part of the relevant market." *Omega

Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *see also Dentsply*, 399 F.3d at

195 (acknowledging the need to "assess[]" the "overall significance to the market" of "other

avenues of distribution" in Sherman Act § 2 exclusive dealing case).

I previously dismissed ICP's exclusive dealing claims for failing to adequately plead a

lack of alternative distribution channels, and failing to properly allege substantial foreclosure in a

relevant market. Since I again conclude that ICP has failed to adequately plead a lack of

alternative distribution channels, I need not revisit the second basis for dismissal.

ICP argues that the Court applied the wrong standard in dismissing the original complaint. ICP contends that "the theoretical possibility of alternative, less-effective, higher-cost distribution channels does not bar a plaintiff's exclusive dealing claim." (D.I. 58 at 19). According to ICP, "[t]he proper inquiry is . . . whether [an alternative channel of distribution] 'poses a real threat' to [the] defendant's monopoly." *Dentsply*, 399 F.3d at 193 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001)). Under this standard,[2] ICP's exclusive dealing claims fail.

ICP acknowledges that direct sales over the Internet are an "alternative distribution mechanism for new heavy construction equipment." (D.I 48 ¶ 65; D.I. 58 at 19). ICP specifically states that, absent the conduct of the Manufacturer Defendants, the IronPlanet website would have been a "*bona fide* alternative distribution channel" to dealer networks, which are tied up with the Manufacturer Defendants' exclusive dealing arrangements. (D.I. 58 at 19). In arguing that other internet marketplaces are not adequate alternatives, ICP insists that IronPlanet is "uniquely efficient" and that other "online outlets are dramatically less-effective and higher-cost than sales through IronPlanet." (D.I. 58 at 19-20). ICP attributes IronPlanet's market position to certain "network effects." "Due to the substantial network effects that accrue to IronPlanet's rapidly growing platform," ICP alleges, "developing a new online marketplace comparable in reach to IronPlanet would take many years, if it could be done at all." (D.I. 48 ¶ 72).

---

[2] Defendants argue that the "poses a real threat" standard articulated in *Dentsply* is inapplicable to the § 1 and § 3 claims at issue here. (D.I. 59 at 13). I disagree. While *Dentsply*'s language is colored by the monopoly claim that was at issue, it is applicable to other exclusive dealing cases. I understand *Dentsply* to simply emphasize that, under the rule of reason, "[t]he test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply*, 399 F.3d at 191.

ICP asserts that "[t]he value of a platform such as IronPlanet to its users grows as the platform matches demand from both sides, which results in a self-reinforcing feedback loop of increasing participation in IronPlanet's online marketplace by buyers and sellers of heavy construction equipment." (*Id.* ¶ 63). ICP also cites to a 2010 SEC filing, where IronPlanet stated that it "benefit[ed] from a network effect," since "the value of [its] marketplace to both sellers and buyers increase[d] as [it] add[ed] more users." (*Id.* ¶ 64).

"In markets characterized by network effects, one product or standard tends toward dominance, because 'the utility that a user derives from consumption of the good increases with the number of other agents consuming the good.'" *Microsoft*, 253 F.3d at 49 (quoting Michael L. Katz & Carl Shapiro, *Network Externalities, Competition, and Compatibility*, 75 Am. Econ. Rev. 424, 424 (1985)). "For example, '[a]n individual consumer's demand to use (and hence her benefit from) the telephone network . . . increases with the number of other users on the network whom she can call or from whom she can receive calls.'" *Id.* (alteration and omission in original) (quoting Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. Chi. L. Rev. 1, 8 (2001)).

In support of its "network effects" theory, ICP relies on *Microsoft* and *United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014). In *Microsoft*, a § 2 case, the D.C. Circuit characterized Microsoft's operating system monopoly as a "'chicken-and-egg' situation," since consumers preferred operating systems with many applications, and application developers preferred operating systems with a substantial consumer base. *Microsoft*, 253 F.3d at 55. *Microsoft* also involved a claim that Microsoft had attempted to monopolize the market for internet browsers. *Id.* at 81-82. The testimony offered at trial on this point, however, amounted to "little more than conclusory statements." *Id.* at 83. Critically, "[t]he proffered testimony

contain[ed] no evidence regarding the cost of 'porting' websites to different browsers or the potentially different economic incentives facing [internet content providers], as opposed to [independent software vendors], in their decision to incur costs to do so." *Id.* at 83-84.

In *Bazaarvoice*, a § 7 case, the defendant had acquired its primary competitor in the product market for "Ratings and Reviews" ("R & R") platforms. *Bazaarvoice*, 2014 WL 203966, at *1. "R & R platforms combine software and services to enable manufacturers and retailers, among other companies, to collect, organize, and display consumer-generated product reviews and ratings online." *Id.* at *2. In assessing the anticompetitive effects of the merger, the court concluded that certain network effects constituted a significant barrier to entry into the market. *Id.* at *49-51. "As more manufacturers sign up for Bazaarvoice's R & R platform, the Bazaarvoice network becomes more valuable to retailers because it allows them to gain access to a greater number of R & R by publishing 'syndicated' R & R content received from manufacturer's websites," and similarly, the more retailers that sign up with Bazaarvoice, the more valuable Bazaarvoice's network would be to manufacturers. *Id.* at *12.

IronPlanet is an internet marketplace. The complaint explains that it has a large number of users. A large user base interested in used heavy construction equipment, coupled with an incantation of "network effects," does not, however, demonstrate that IronPlanet is the sole means of accessing the Internet as a means of distribution for new heavy construction equipment. *See Microsoft*, 253 F.3d at 84 (In trial context, "[s]imply invoking the phrase 'network effects' without pointing to more evidence does not suffice to carry plaintiffs' burden in this respect."). ICP identifies the Internet, in the form of IronPlanet, as a channel of distribution which "poses a real threat" to the Manufacturer Defendants' exclusive dealing networks. *Dentsply*, 399 F.3d at 193 (quoting *Microsoft*, 253 F.3d at 71). ICP then argues that IronPlanet has such a large base of

users and is so efficient, that it has effectively monopolized an entire mode of distribution, just as Microsoft and Bazaarvoice dominated their respective markets. The Amended Complaint lacks any factual allegations to support this conclusion. Bazaarvoice's network effects arose from manufacturers and retailers signing up with its service, rather than a rival's. In *Microsoft*, application developers chose to develop software for Windows, rather than an operating system with fewer established users. The Amended Complaint does not explain, or even suggest, how an auction website like IronPlanet is comparable. IronPlanet, in some respects, resembles the browser market at issue in *Microsoft*. There, the plaintiff did not offer any evidence about the "cost of 'porting' websites to different browsers" or the "economic incentives" associated with doing so. *Microsoft*, 253 F.3d at 84. In other words, while the plaintiff had shown that the process of modifying or "port[ing]" an application from Windows to another operating system was "both time[-]consuming and expensive," it made no such showing with respect to the costs of modifying or "porting" a website to be compatible with more than one browser. *Id.* at 53, 84. Similarly, ICP has not alleged facts which plausibly suggest that, when end-users would visit IronPlanet to buy new construction equipment, they would do so to the exclusion of other websites. Put another way, no facts alleged suggest that, in the event IronPlanet actually sold new construction equipment, users of that service would be unable to turn elsewhere.[3] ICP concedes that direct sales over the Internet constitute an alternative means of distributing new heavy construction equipment. ICP also argues that, having been excluded from IronPlanet, it has been effectively foreclosed from the Internet. This bold conclusion finds no factual support in the Amended Complaint.

---

[3] This underscores another problem with ICP's claim. ICP argues that IronPlanet is the sole means of distributing new heavy construction equipment over the Internet, when IronPlanet currently offers no sales of new heavy construction equipment over the Internet.

ICP has failed to adequately plead a lack of alternative channels of distribution. Therefore, it has not made a *prima facie* showing that the exclusive dealing arrangements "foreclose from competition *any* part of the relevant market." *Omega Envtl.*, 127 F.3d at 1163; *see also PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7-8 (N.D. Cal. Apr. 25, 2014).[4] Accordingly, ICP has failed to state a claim for exclusive dealing pursuant to Sherman Act § 1 and Clayton Act § 3. Therefore, Defendants' motion to dismiss ICP's exclusive dealing claims is granted.

## C. Motion to Reconsider Dismissal of Monopolization and Attempted Monopolization

ICP seeks reconsideration of both its monopolization and attempted monopolization claims. These claims are directed solely at Caterpillar.

To state a claim for monopolization, the plaintiff must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "Monopoly power is the ability to control prices or exclude competition in a given market." *Grinnell*, 384 U.S. at 571. To state a claim for attempted monopolization, a plaintiff must plead that the defendant "(1) had the specific intent to monopolize the relevant market, (2) engaged in anti-competitive or exclusionary conduct, and (3) possessed a sufficient market power to come dangerously close to success." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).

---

[4] *PNY Technologies* discusses the more common situation, whether direct internet sales is an alternative channel of distribution to retailers, not whether direct internet sales on a website to be determined is an alternative channel of distribution to an existing website.

The boundaries of the relevant market "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Products are considered reasonably interchangeable if "one product is roughly equivalent to another for the use to which it is put." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 2007). A relevant geographic market "must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).[5] A geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336-37 (internal quotation marks omitted). "[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Where "the relevant market is legally insufficient," however, "a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

These counts were previously dismissed for a failure to allege a relevant market, as well as a failure to plead monopoly power. At oral argument, ICP conceded that, if the court did not accept its product markets and geographic markets, "the monopolization case goes away." (D.I. 63 at 76). Since the Amended Complaint still fails to allege a relevant geographic market which could support a monopolization claim, I will not reconsider the previous dismissal.

---

[5] Although *Tampa Electric* is a Clayton Act § 3 case, its "relevant geographic market framework is applied routinely in Sherman Act cases." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 n.2 (4th Cir. 2011); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

ICP alleges that "[e]ach and every state within the United States is . . . a relevant geographic market, and smaller markets within the boundaries of many states exist as well, as will be proven at trial." (D.I. 48 ¶ 41).  In support of these markets, ICP alleges that "[e]nd users of heavy construction equipment demand convenient and expeditious service and support, and thus typically do not purchase new heavy construction equipment from equipment dealers without an authorized service location within 75 miles." (*Id.*).  ICP further asserts that because "[e]quipment dealers typically do not resell new heavy construction equipment . . . outside their service areas in any substantial quantity," "heavy construction equipment manufacturers charge different prices to equipment dealers in different states, and within certain regions within many states." (*Id.*).

To support these proposed markets, ICP further alleges that "between 2014 and 2015, prices for used crawler dozers increased by 40 percent in New York, but only 20 percent in adjacent Pennsylvania, and while prices increased in Georgia by more than 25 percent, prices in adjacent Alabama declined by more than 38 percent." (*Id.* ¶ 42).  Additionally, "[w]ithin California, prices for used crawler dozers displayed substantial regional variation over the same time period, down more than 25 percent in Northern California as compared to an increase in the same time period of over 10 percent in Central California." (*Id.*).

"[T]he economic significance of a geographic area 'does not depend upon singular elements such as population, income, political boundaries, or geographic extent, but upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626-27 (5th Cir. 2002) (quoting Earl W. Kintner, *Federal Antitrust Law* § 38.2 (1st ed. 1984)).[6]  Put

---

[6] *Apani* is a § 3 case.  *Apani* principally relies on the *Tampa Electric* framework, as well as Professor Kintner's *Federal Antitrust Law* treatise.  In discussing the definition of a geographic market, the treatise

17

another way, for a geographic segment to qualify as economically significant, it must "include[]
an appreciable proportion of the product market as a whole, or a proportion of the product
market which is largely segregated from, independent of, or not affected by competition
elsewhere." *Id.* at 627 (quoting Earl W. Kintner, *Federal Antitrust Law* § 38.2 (1st ed. 1984)).

Here, ICP's proposed geographical markets are facially unsustainable. ICP relies on
political subdivisions between states to define its proposed markets. In support of these
geographical markets, ICP alleges that end users "typically do not purchase new heavy
construction equipment from equipment dealers without an authorized service location within 75
miles." (D.I. 48 ¶ 41). This allegation does not support Plaintiff's proposed markets. If a 75-
mile radius around a potential customer is the area of effective competition, state-wide markets
may be both too large—as someone in Pittsburgh would not look for equipment in
Philadelphia—and too small—as someone in Wilmington would look for equipment in
Philadelphia, Camden, and Baltimore.

ICP's allegations about used crawler dozer prices similarly fail to provide the requisite
factual support for its proposed geographic markets. The allegations describe variations in price
trends for one type of used heavy construction equipment in several states and regions. Used
heavy construction equipment and new heavy construction equipment occupy different markets.
(D.I. 48 ¶ 38). Additionally, even if these price differences were relevant to the market for new
heavy construction equipment, they do not come close to suggesting that "each and every state"
is a relevant geographic market for each alleged product market.[7] Simply put, there are no

---

authors do not draw a distinction between Sherman Act cases and Clayton Act cases. *See* Joseph P. Bauer
et al., *Federal Antitrust Law* § 10.15 (3d ed. 2013). Therefore, in assessing whether a § 2 plaintiff has
adequately defined a relevant geographic market, *Apani* is instructive.
[7] ICP alleges that each of the twelve types of new heavy construction equipment has its own individual
product market. (D.I. 48 ¶¶ 34-39).

allegations that plausibly suggest any state, let alone all states, is a "market which is largely

segregated from, independent of, or not affected by competition elsewhere." *Apani*, 300 F.3d at

627 (quoting Earl W. Kintner, *Federal Antitrust Law* § 38.2 (1st ed. 1984).[8]

In opposition, ICP cites to *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637

F.3d 435 (4th Cir. 2011) and *Universal Hospital Services, Inc. v. Hill-Rom Holdings, Inc.*, 2015

WL 6994438 (W.D. Tex. Oct. 15, 2015). In *Kolon*, the Fourth Circuit, in reversing the district

court's dismissal of the complaint, held that the plaintiff had "pled plausible reasons for limiting

the geographic market to the United States." *Kolon*, 637 F.3d at 447. The plaintiff had pled that

certain "market realities" led the U.S. market to "function[] as a distinct market." *Id.* at 444.

The plaintiff had described "technical, legal, and other barriers to entry," and alleged that the

U.S. "market [was] distinct from other markets; prices [were] high while supply [was] low; [and]

some foreign manufacturers d[id] not sell . . . to U.S. customers . . . ." *Id.* In *Universal Hospital*

*Services*, the plaintiff alleged both a national market and certain regional submarkets. *Universal*

*Hosp.*, 2015 WL 6994438, at *2. "The complaint state[d] that [the] national market exist[ed] for

customers whose rental needs [were] not time sensitive or where the costs associated with

shipping equipment [were] not cost prohibitive," while "regional geographic sub-markets

exist[ed]" "[f]or customers whose needs [were] time-sensitive." *Id.* The "submarkets for time-

sensitive rentals ha[d] a radius of ninety miles which [were] centered around regional

distribution centers owned and operated by both Hill-Rom and Universal." *Id.* In short, the

plaintiff alleged "a specific submarket supported by economically significant bounds which

address[ed] where customers turn[ed] for [the relevant products]." *Id.* at *4.

---

[8] Further, ICP alleges that it, through sales over the Internet, would have become "a direct and immediate competitive threat to the Manufacturer Defendants" in at least twenty-five states. (D.I. 48 ¶¶ 79-80). This suggests that "the area of effective competition" for the alleged product markets extends beyond individual states. *Tampa Elec.*, 365 U.S. at 327.

*Kolon* and *Universal Hospital* are inapposite. *Kolon* stands for the proposition that price

discrimination markets may be used to define relevant geographic markets. *See Kolon*, 637 F.3d

at 444-48; *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* §

4.2.2 (2010). After all, price discrimination is most effective when customers are unable to turn

to an alternative supply, whether by substituting goods or purchasing outside the region. Unlike

the plaintiff in *Kolon*, however, ICP has merely alleged that the price trends for used crawler

dozers vary between a few states. These allegations do not support an inference that Caterpillar

practices price discrimination when selling new heavy construction equipment in different states.

In *Universal Hospital*, the plaintiff explained how, under certain circumstances, the area of

effective competition was limited to the area surrounding distribution centers. *Universal Hosp.*,

2015 WL 6994438, at *2. The Amended Complaint lacks any factual allegations that would

support defining the relevant market in terms of the political boundaries between states.

ICP has failed to adequately define a relevant geographic market.[9] Therefore, there is no

"clear error of law or fact" to correct, or "manifest injustice" to prevent. *Max's Seafood Café ex*

*rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The motion for

reconsideration and leave to amend is denied with respect to the monopolization and attempted

monopolization claims.

**D.    Motion to Reconsider Unlawful Merger Under Sherman Act § 1 and Clayton Act § 7**

Section 7 of the Clayton Act prohibits mergers the effect of which "may be substantially

to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "A private plaintiff

seeking to enjoin an acquisition 'need only prove that its effect *may be* substantially to lessen

competition.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007) (internal

---

[9] Since ICP's exclusive dealing claims also require ICP to define a relevant geographic market, those claims—to the extent they rely on the smaller geographic markets—could also be dismissed on this basis.

quotation marks omitted) (quoting *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990)).

"The prospective harm to competition must not, however, be speculative." *Id.* Instead, there

must be "'a threat of antitrust injury' which produces 'directly harmful effects' that are 'closely

related to the violation.'" *Id.* (quoting *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours &

Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987)). "[I]njury . . . will not qualify as 'antitrust injury'

unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *Atl. Richfield

Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

   ICP's unlawful merger claims were dismissed for failing to allege that IronPlanet's

merger with AAS had the substantial effect of lessening competition in the market for new heavy

construction equipment. ICP's proposed amendments to the complaint fail for the same reason.

   ICP again alleges that "the merger of AAS and IronPlanet—both entities which operate

in the market for used heavy construction equipment" has the effect of "lessen[ing] competition

in the market for new heavy construction equipment." (D.I. 45 at p. 25). To support this theory,

ICP contends that a post-merger IronPlanet will be "'part of the extended Caterpillar network,'

and will have incentives aligned with Caterpillar with respect to the entry of disruptive new

competitors." (D.I. 48 ¶ 113). Therefore, ICP alleges, IronPlanet will be "less interested in

supporting the entry of new and disruptive competitors into the relevant heavy construction

equipment markets." (*Id.*).

   "[A]ntitrust injury must be caused by the antitrust violation—not a mere causal link, but a

direct effect." *Broadcom*, 501 F.3d at 321 (quoting *City of Pittsburgh v. W. Penn Power Co.*,

147 F.3d 256, 267-78 (3d Cir. 1998)). The "prospective harm to competition" alleged by ICP is

entirely "speculative." *Id.* ICP does not allege any harm directly traceable to the merger. Any

"direct harmful effects" that are "closely related to the violation" will be borne by firms which

actually compete in the market in which AAS operates—i.e., the market for used heavy construction equipment. *Alberta Gas*, 826 F.2d at 1240. Since ICP "does not compete in these markets, it will not experience these effects firsthand." *Broadcom*, 501 F.3d at 322.

ICP has failed to show a "clear error of law or fact" or "manifest injustice." *Max's Seafood*, 176 F.3d at 677. Therefore, ICP's motion for reconsideration and leave to amend is denied with respect to the unlawful merger claims.

### E.    Related State Law Claims

In the previous opinion, after dismissing ICP's federal causes of action, the Court declined to exercise supplemental jurisdiction over ICP's related state law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Defendants' instant motion is denied with respect to ICP's Sherman Act § 1 group boycott claims. Since the Court maintains original jurisdiction over those claims, the Court has supplemental jurisdiction over ICP's state law claims, which arise from a "common nucleus of operative fact." *Gibbs*, 383 U.S. at 725.

Defendants also argue that ICP's state law claims "fail[] on the merits," but include no argument for that assertion. (D.I. 55 at p. 11). Neither ICP, nor this Court, is under any obligation to craft Defendants' argument. Therefore, Defendants' motion to dismiss is denied with respect to Counts Five through Twelve.

### F.    Prejudice

A dismissal under Fed. R. Civ. P. 12(b)(6) is a "judgment on the merits" and is therefore ordinarily presumed to be with prejudice. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981). ICP's exclusive dealing claims are therefore dismissed with prejudice.

22

## IV.   CONCLUSION

For the reasons set forth above, ICP's motion for reconsideration and leave to amend (D.I. 49) is **DENIED,** and Defendants' motion to dismiss (D.I. 54) is **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order will be entered.