IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC,<br><br>   *Plaintiff*,<br><br>  v.<br><br>CATERPILLAR INC., KOMATSU AMERICA CORP., ASSOCIATED AUCTION SERVICES, LLC d/b/a CAT AUCTION SERVICES, RING POWER CORPORATION, ZIEGLER INC., and THOMPSON TRACTOR COMPANY, INC.<br><br>   *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 15-108-RGA<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

John W. Shaw, Esq., Andrew E. Russell, Esq., and Nathan R. Hoeschen, Esq., Shaw Keller LLP, Wilmington, DE; David Boies, Esq., Boies Schiller Flexner LLP, Armonk, NY; James P. Denvir, Esq., Amy J. Mauser, Esq., Christopher G. Renner, Esq., Michael S. Mitchell Esq., Jonathan Shaw, Esq., and William Bloom, Esq., Boies Schiller Flexner LLP, Washington, D.C. *Attorneys for Plaintiff International Construction Products LLC*.

David J. Baldwin, Esq. and Ryan C. Cicoski, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Robert G. Abrams, Esq., Gregory J. Commins, Jr., Esq., Danyll W. Foix, Esq., and Carey S. Busen, Esq., Baker & Hostetler LLP, Washington, D.C. *Attorneys for Defendant Caterpillar Inc*

Henry E. Gallagher, Jr., Esq., Connolly Gallagher LLP, Wilmington, DE; Quentin R. Wittrock, Esq. and Richard C. Landon, Esq., Gray Plant Mooty, Minneapolis, MN. *Attorneys for Associated Auction Services, LLC and Ziegler Inc.*

Denise S. Kraft, Esq. and Brian A. Biggs, Esq., DLA Piper LLP US, Wilmington, DE; David H. Bamberger, Esq., DLA Piper LLP US, Washington, D.C.; Adam I. Steene, Esq., DLA Piper LLP US, New York, NY. *Attorneys for Komatsu America Corp.*

M. Duncan Grant, Esq. and James H. S. Levine, Esq., Pepper Hamilton LLP, Wilmington, DE; Jeremy Heep, Esq., Robin P. Sumner, Esq., and Melissa Hatch O'Donnell, Esq., Pepper Hamilton LLP, Philadelphia, PA. *Attorneys for Defendant Thompson Tractor Company, Inc.*

Dominick T. Gattuso, Esq., Heyman Enerio Gattuso & Hirzel, LLP, Wilmington, DE 19801; Niels P. Murphy, Esq., Gerry A. Giurato, Esq., and Murphy & Anderson, PA, Jacksonville, FL. *Attorneys for Defendant Ring Power Corporation.*

October *10*, 2019
Wilmington, DE

ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff International Construction Products LLC ("ICP") asserts claims against defendants Caterpillar Inc., Komatsu America Corp., Associated Auction Services LLC, Ziegler Inc., Thompson Tractor Company, Inc., and Ring Power Corporation for antitrust violations under the Sherman Act § 1 (Counts 1-2) and for tortious interference, civil conspiracy, and aiding and abetting tortious conduct under state law (Counts 3-10). (D.I. 162). Presently before the Court are Defendants' motions to dismiss the second amended complaint. (D.I. 180, D.I. 182, D.I. 183, D.I. 188, D.I. 190, D.I. 191, D.I. 194). All Defendants request dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In addition, Ziegler, Thompson Tractor, and Ring Power request dismissal pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. For the reasons set forth herein, the motions to dismiss filed by Associated Auction Services, Ziegler, Thompson Tractor, and Ring Power are granted, and the motions to dismiss filed by Caterpillar and Komatsu are granted in part and denied in part.

## I.   BACKGROUND

### A.   Procedural History

ICP initiated this action on January 29, 2015. In the original complaint, ICP asserted antitrust and state law claims against Caterpillar, Komatsu, Volvo Construction Equipment North America, LLC, and Associated Auction Services. (D.I. 1 at ¶¶ 1, 113-52). The antitrust claims arose under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18.

In April 2015, the Defendants filed a motion to dismiss the original complaint, which I granted on January 21, 2016. (D.I. 27, D.I. 28, D.I. 30, D.I. 33). The counts based on the Sherman

Act § 1, Clayton Act § 3, and state law were dismissed without prejudice. But the counts based on the Sherman Act § 2 and Clayton Act § 7 were dismissed with prejudice. (D.I. 45, D.I. 46).

On February 4, 2016, ICP filed a motion for reconsideration and leave to amend. (D.I. 49). ICP proposed to amend the complaint as to the claims dismissed without prejudice and asked the court to reconsider its dismissal of claims with prejudice. Defendants opposed the motion for reconsideration and filed a motion to dismiss the amended complaint. (D.I. 54). On August 22, 2016, I denied the motion for reconsideration and granted in part and denied in part the motion to dismiss. (D.I. 64, D.I. 65). Specifically, I did not dismiss the group boycott claims under the Sherman Act § 1 but did dismiss the exclusive dealing claims under the Sherman Act § 1 and all claims under the Clayton Act § 3. (D.I. 64, D.I. 65).

On February 24, 2017, I entered a scheduling order that provided for phased discovery. (D.I. 95). Phase I, which was completed by August 24, 2017, included discovery into the "alleged agreement to boycott IronPlanet." (*Id.* at ¶ 3(a)(i); D.I. 115). On August 25, 2017, the day after the close of Phase 1 discovery, ICP filed a motion for leave to file a second amended complaint. (D.I. 123). The second amended complaint dropped Volvo as a defendant but added Ring Power, Ziegler, and Thompson Tractor. (D.I. 123-3 at 1). Volvo was formally dismissed from the case by stipulation on December 1, 2017. (D.I. 147). On September 26, 2018, I granted the motion for leave over Defendants' objections, and ICP filed its second amended complaint that same day. (D.I. 139, D.I. 160, D.I. 161, D.I. 162).

## B.  Factual Background

### 1.  The Relevant Market and Players

ICP's antitrust claims are concerned with the market for "new heavy construction equipment." (D.I. 162 at ¶ 29). ICP imports into and distributes in the United States new heavy

2

construction equipment made by foreign manufacturers. (*Id.* at ¶ 61). Caterpillar and Komatsu (the "Manufacturer Defendants") are in the business of manufacturing new heavy construction equipment. (*Id.* at ¶¶ 8-9, 28). Historically, new heavy construction equipment is sold to end users through local equipment dealers. (*Id.* at ¶¶ 22-23, 36). Ziegler, Ring Power, and Thompson Tractor (the "Dealer Defendants") are three of the forty-eight Caterpillar equipment dealers located in the United States. (*Id.* at ¶¶ 11-13, 46).

In addition to selling new heavy construction equipment through their local dealerships, the Dealer Defendants sell used heavy construction equipment through consignment with online marketplaces. The second amended complaint identifies Associated Auction Services, IronPlanet, Ritchie Brothers, and EquipmentOne as online marketplaces for the sale of used heavy construction equipment. (*Id.* at ¶¶ 10, 55, 57, 70). IronPlanet is the largest online marketplace in the United States for the sale of used heavy construction equipment and, according to ICP, offers features for which the other online marketplaces are not adequate substitutes. (*Id.* at ¶¶ 50, 54-55). Although Associated Auction Services is owned in part by Caterpillar and some of its equipment dealers, Caterpillar's equipment dealers are not required to use Associated Auction Services for consignments of used equipment. (*Id.* at ¶¶ 10, 47). Indeed, less than a quarter of the Caterpillar equipment dealers located in the United States use Associated Auction Services exclusively for the disposal of their used heavy construction equipment. (*Id.* at ¶ 89). Some Caterpillar equipment dealers, including the Dealer Defendants, use IronPlanet to sell used heavy construction equipment. (*Id.* at ¶ 47).

### 2. ICP Enters the Relevant Market

In 2013, ICP contracted with Lonking Holdings Ltd., a Chinese manufacturer of new heavy construction equipment, to serve as Lonking's master distributor in the United States. (D.I. 162 at

3

¶¶ 65, 97). ICP planned to sell the new equipment directly to end users through ICPDirect.com, an internet store that would be hosted and supported by IronPlanet. (*Id.* at ¶ 66). On March 3, 2014, ICP and IronPlanet signed a services agreement, called a Hosted Site Agreement, which memorialized the plan. (*Id.* at ¶ 69). ICP announced its partnership with IronPlanet the same day. (*Id.* at ¶ 74). Because IronPlanet operated exclusively in the used equipment market, its agreement with ICP was its first and only foray into the new equipment market. (*Id.* at ¶ 70). Thus, the only new equipment that would be available on IronPlanet would belong to ICP. As the complaint acknowledges, "The Manufacturer Defendants and the Dealer Defendants do not themselves sell new heavy construction equipment through IronPlanet, and had no interest in competing with ICP to do so." (*Id.* at ¶ 112).

### 3. IronPlanet and Associated Auction Services Merge

Associated Auction Services and IronPlanet have held merger discussions in the past. (D.I. 162 at ¶ 87). These merger discussions were renewed in February 2014, before ICP announced its partnership with IronPlanet. (*Id.* at ¶ 85). Associated Auction Services is owned in part by Caterpillar and some of its equipment dealers, including Ziegler. (*Id.* at ¶¶ 10-13). IronPlanet is owned in part by the Manufacturer Defendants, another manufacturer, venture capital firms, and certain Caterpillar dealers, including Ring Power. (*Id.* at ¶ 119). Caterpillar, Komatsu, and Ring Power were minority investors in IronPlanet. (*Id.* at ¶ 60). In 2015, Associated Auction Services and Iron Planet completed the merger. (*Id.* at ¶ 10).

### 4. The Conspiracy

According to second amended complaint, Caterpillar wanted to block ICP's entry as a competitor into the market for new heavy construction equipment by forcing IronPlanet to discontinue its relationship with ICP. (D.I. 162 at ¶¶ 97, 101). To achieve this goal, Caterpillar

4

used two tools: the consignment of used heavy construction equipment by its equipment dealers and a potential merger with Associated Auction Services. According to ICP, Caterpillar's equipment dealers would withhold or consign used heavy construction equipment as a stick or carrot respectively, to induce IronPlanet to end its business relationship with ICP. (*Id.* at ¶ 102). In addition, Caterpillar would either force the merger to bring IronPlanet under its control or threaten to block the merger, which was a transaction IronPlanet desired. (*Id.* at ¶¶ 101-102). Finally, the Dealer Defendants agreed to join the conspiracy because Caterpillar requires exclusivity from its dealers, and Associated Auction Services joined the conspiracy because it is owned by Caterpillar and some of its equipment dealers. (*Id.* at ¶ 131). The complaint does not elaborate on Komatsu's role in the conspiracy. Nevertheless, the complaint alleges that it agreed to participate in the conspiracy to protect its investments in IronPlanet. (*Id.* at ¶ 121).

## II.   STANDARD OF REVIEW

### A.  Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion to dismiss, the complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Twombly*, 550 U.S. at 555. In assessing the plausibility of a claim, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents

5

incorporated by reference, and items subject to judicial notice. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### B. Rule 12(b)(2)

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal jurisdiction over defendant. Fed. R. Civ. P. 12(b)(2). Where, as here, the court has not conducted an evidentiary hearing, the plaintiff must allege facts sufficient to make a prima facie case of personal jurisdiction over the defendant. *O'Connor v. Sandy Lane Hotel Co*., 496 F.3d 312, 316 (3d Cir. 2007).

## III.   DISCUSSION

The second amended complaint asserts claims based on the Sherman Act § 1 and state law. All Defendants argue that all of the counts should be dismissed for failure to state a claim. The Dealer Defendants further argue that the claims against them should be dismissed for lack of personal jurisdiction. Accordingly, I will address in order, personal jurisdiction over the Dealer Defendants, the antitrust claims and, finally, the state law claims.

### A. PERSONAL JURISDICTION

Each Dealer Defendant has moved to dismiss for lack of personal jurisdiction. (D.I. 182, D.I. 183, D.I. 188). Ziegler is incorporated under the laws of the State of Minnesota, has a principal place of business in Minnesota, and maintains branch locations in Minnesota, Iowa, Wisconsin, and Missouri. (D.I. 162 at ¶ 11). Ring Power is incorporated under the laws of the State of Florida, has a principal place of business in Florida, and maintains branch locations in Florida, California, Texas, Georgia, North Carolina, South Carolina, New Jersey, and Rhode Island. (*Id*. at ¶ 12). Thompson Tractor is incorporated under the laws of the State of Alabama, has a principal place of

6

business in Alabama, and maintains branch locations in Alabama, northwest Florida, and Georgia. (*Id*. at ¶ 13). None of the Dealer Defendants maintain a location in Delaware.

For personal jurisdiction to exist over a non-resident defendant, two requirements must be satisfied, one statutory and one constitutional. *Bell Helicopter Textron, Inc. v. C & C Helicopter Sales*, *Inc*., 295 F. Supp. 2d 400, 403 (D. Del. 2002). Specifically, there must be a statutory basis for jurisdiction pursuant to Delaware's long-arm statute. *Id.* In addition, the exercise of jurisdiction over the defendant must comport with the Due Process Clause of the Fourteenth Amendment. *Id*.

Delaware's long-arm statute extends to those non-residents "who in person or through an agent [c]ause[] tortious injury in the State by an act or omission in this State." 10 *Del. C*. § 3104(c)(3). ICP relies on the conspiracy theory of jurisdiction, whereby the in-state co-conspirators are considered "agents" of the out-of-state co-conspirators, and the actions of the in-state co-conspirators are imputed to the out-of-state co-conspirators for the purposes of establishing personal jurisdiction under the long-arm statute. D.I. 200 at 38 (citing *Hercules Inc*., 611 A.2d 476, 480 (Del. 1992); *HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 307 (Del. Ch. 1999)). Delaware may exercise personal jurisdiction over a defendant who participated in a conspiracy where it is shown, pursuant to the test set forth in *Istituto Bancario*, that:

(1) a conspiracy . . . existed;

(2) the defendant was a member of that conspiracy;

(3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state;

(4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and

(5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

7

*Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1981).

Ultimately, ICP's conspiracy theory of jurisdiction fails under the third prong of the *Istituto Bancario* factors. The only conspiracy plausibly alleged in the complaint was a boycott of IronPlanet in the Spring of 2014. But ICP has not identified any acts that occurred in Delaware in furtherance of that conspiracy. The only act ICP identifies that occurred in Delaware is the merger of Associated Auction Services and IronPlanet in 2015. (D.I. 200 at 40-41). But this act was not an "essential step," *Istituto Bancario*, 449 A.2d at 227, in furtherance of the conspiracy because the object of the conspiracy was achieved in the Spring of 2014 when Iron Planet repudiated its contract with IPC, and the merger was not until 2015 after the merger agreement was executed in December 2014 (D.I. 162 at ¶ 10, and, as I have previously ruled, that merger did not unlawfully restrain trade. (*See* D.I. 45 at 25 (dismissing with prejudice claims for unlawful merger under Sherman Act § 1 and Clayton Act § 7, because ICP could not show that the merger substantially lessens competition); D.I. 64 at 21-22 (denying motion for reconsideration)). Because ICP failed to establish the third prong of the *Istituto Bancario* factors, ICP has not shown that the court has personal jurisdiction over the Dealer Defendants. Accordingly, all claims against the Dealer Defendants are dismissed for lack of personal jurisdiction.

## B. ANTITRUST CLAIMS

To maintain an antitrust action under § 1 of the Sherman Act, a plaintiff must plead two elements: (1) "the defendant was a party to a contract, combination ... or conspiracy;" and (2) "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *In re Ins. Brokerage*, 618 F.3d 300, 315 (3d Cir. 2010)). Defendants assert that ICP's second amended complaint fails to adequately plead either element.

8

### 1. Concerted Action

Courts have collectively described the first element of a Section 1 claim—requiring a "contract, combination, or conspiracy"—as "concerted action." *Ins. Brokerage*., 618 F.3d at 315 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir.1999)). Concerted action is defined as "a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Ins. Brokerage*, 618 F.3d at 315 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004)). Therefore, Section 1 claims "always require the existence of an agreement." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010); 15 U.S.C. § 1. The agreement may be shown by either direct or circumstantial evidence. *Lifewatch Serv. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018).

According to ICP, there were two agreements that unlawfully restrained trade and each can be established by direct or circumstantial evidence. The two agreements are: (1) an agreement to boycott IronPlanet unless it terminated its business relationship with ICP, and (2) an agreement to remove IronPlanet as an independent entity through its merger with Associated Auction Services. (D.I. 162 at ¶¶ 3, 129). Because I previously ruled that the merger agreement between IronPlanet and Associated Auction Services did not restrain trade, ICP cannot rely on the merger agreement to establish concerted action. (*See* D.I. 45 at 25; D.I. 64 at 21-22). This leaves the agreement to boycott IronPlanet, which ICP must plausibly allege through either direct or circumstantial evidence.

### a. Direct Evidence of an Agreement to Boycott

According to ICP, there are four documents that each provide direct evidence of an agreement among Defendants to withhold equipment from IronPlanet: (1) a March 18, 2014 email; (2) a March 26, 2014 draft letter; (3) an April 7, 2014 email chain; and (4) a May 2, 2014 power

9

point presentation.  (D.I. 200 at 8-12).  Direct evidence is "evidence that is explicit and requires

no inferences to establish the proposition or conclusion being asserted." *Ins. Brokerage*, 618 F.3d

at 324 n. 23.  None of the documents ICP identified qualify as direct evidence of an agreement

among Defendants to boycott Iron Planet.

The March 18, 2014 email is from William Hoeft, the Chairman of Associated Auction

Services, to Greg Owens, the CEO of Iron Planet, and primarily addresses the most recent merger

offer.  (D.I. 162 at ¶ 104; D.I. 195-1, Ex. 1).  Hoeft is also the Chairman, President, and CEO of

Ziegler, and his signature block contains his Ziegler titles and contact information.  (D.I. 195-1,

Ex. 1).  ICP focuses on the following passage:

> On a side note, we, and Caterpillar, noted the recent article in Equipment World,
> which highlighted Iron Planet's new relationship with International
> Construction Products. We *would like to better understand* that relationship, as
> *we are concerned* that Caterpillar and CAT dealers would have significant
> concerns about any arrangement where IronPlanet is providing auction services
> for new equipment for a Caterpillar competitor.

(*Id.* (emphasis added)).  This passage is not direct evidence of an agreement by Defendants to

boycott IronPlanet.  Words like "we are concerned" and "we would like to better understand" do

not literally express an agreement among Defendants to withhold used equipment.  At most, the

words could be euphemisms for threats to withhold equipment.  But "cases require that direct

evidence of an illegal agreement be established with much greater clarity." *InterVest, Inc. v.

Bloomberg, L.P.*, 340 F.3d 144, 156 n. 5 (3d Cir. 2003).  Finally, the email does not mention

Komatsu, which is an equipment manufacturer in its own right and not a member of Caterpillar's

dealer network.

The March 26, 2014 letter is another communication from Hoeft to Owens, primarily

addressing merger negotiations.  (D.I. 195-1, Ex. 2).  This time Hoeft's signature block contains

his title for Associated Auction Services.  Although the letter is in draft form, ICP asks me to infer

that it was sent to IronPlanet and sent with no changes.  (D.I. 200 at 13 n. 4).  ICP relies on the

following passage:

> While you state that our Dealer network from a diversity standpoint is a
> weakness, we view it as an incredible strength and one that will bring substantial
> opportunity to the combined entity under the CAT brand and through CAT's
> committed leadership.  CAT is the global leader, and CAT has the *ability* to both
> leverage its global strength, *or, alternatively*, provide leverage against IP if we
> are to go our own separate ways.

(D.I. 162 at ¶ 106; D.I. 195-1, Ex. 2 (emphasis added)).  Even assuming the letter was sent with

no changes, the document is not direct evidence, because a reference to the "ability" to leverage a

"Dealer network" and "alternatives" does not explicitly identify a then-existing agreement among

Defendants to withhold equipment from IronPlanet.  At most, it suggests one of several inchoate

possibilities depending on how negotiations around the merger unfold.  In addition, there is again

no mention of Komatsu.

The April 7, 2014 email chain contains communications among IronPlanet employees after

one of its territory managers spoke by phone to Thompson Tractor's used-equipment manager.

(D.I. 162 at ¶ 107; D.I. 195-1, Ex. 3).  The territory manager emailed a sales director, stating:

> Update on Thompson.  We need a statement from Owens, Jeter, or Langham
> with our status & where we are headed if anywhere with ICP…. Until we have
> a statement Richard/Thompson is in the holding pattern with us.

(D.I. 195-1, Ex. 3).  About an hour later, Jeff Jeter, who according to the email chain is a Vice

President at IronPlanet, wrote, "Our deal with ICP has been terminated and removed from the

IronPlanet website."  (*Id.*).  The email chain references no other defendant but Thompson Tractor

and no agreement except the one between IronPlanet and ICP.  Accordingly, the April 7, 2014

11

email chain is not direct evidence of an agreement among Defendants to withhold equipment from IronPlanet.

Finally, on May 2, 2014, an investment banking firm made a power point presentation to the board of Associated Auction Services regarding its potential merger with IronPlanet. (D.I. 162 at ¶ 92). Page 8 of the presentation contains a table labeled, "Key terms to negotiate with [IronPlanet]/key terms negotiated." (D.I. 159-1 at 8). There are ten rows in the table, each representing a different term. Then there are five columns, labeled as "key term," "description," "key considerations," "starting point," and "ending point." (*Id.*). ICP is focused on the term "Cat Dealer Support," which is described as "[a]greements by CAT dealers to use NewCo for Auctions." (*Id.*). The starting point states "operating and remarketing agreements with large dealers." (*Id.*). The ending point states "[s]imple agreement-no commitment levels." (*Id.*). The entirety of the relevant row appears as follows:

| Key Term | Description | Key Considerations | Starting Point | Ending Point |
|---|---|---|---|---|
| CAT Dealer Support | • Agreements by CAT dealers to use NewCo for auctions | • Use of CAT leverage | • Operating and remarketing agreements with large dealers | • Simple agreement – no commitment levels<br>• Production leads to greater ownership percentage |

I previously considered the significance of this power point presentation in the context of ICP's motion for leave to file the second amended complaint. At the time, ICP argued that it "could not understand the significance of the 'simple agreement' until it received other 'key' documents." (D.I. 160 at 4). I agreed, stating that "the significance of the presentation … is certainly less than apparent from my review of it." (*Id.* at 5). ICP now argues that the power point presentation reflects an agreement to "funnel used equipment to IronPlanet if—and only if— IronPlanet agreed to a merger with [Associated] Auction Services on terms that included breaching IronPlanet's contract with ICP." (D.I. 200 at 11). There is, however, no mention in the power

12

point presentation of IronPlanet's contract with ICP, let alone a threat to withhold equipment unless IronPlanet breached that contract. The meaning of "simple agreement" remains opaque even when considered along side the other three documents ICP asserts are direct evidence of an agreement. Accordingly, ICP fails to allege direct evidence of an agreement among Defendants to boycott IronPlanet.

### b. Circumstantial Evidence of an Agreement to Boycott

To show circumstantial evidence of an agreement, a plaintiff must allege parallel conduct and "plus factors." *LifeWatch*, 902 F.3d at 333. The plus factors "could include evidence (1) 'that the defendant had a motive to enter into a ... conspiracy,' (2) 'that the defendant acted contrary to its interests,' or (3) 'implying a traditional conspiracy.'" *Id.* (quoting *Ins. Brokerage*, 618 F.3d at 321).

I previously found on the motion to dismiss the amended complaint that ICP adequately alleged parallel conduct by the Manufacturer Defendants and independently established each plus factor, even though only one plus factor is required. (D.I. 64 at 6-9). I found parallel conduct in particular, because "[e]ach of the Manufacturer Defendants communicated the same or similar threat to IronPlanet within days of one another." (D.I. 64 at 6 (quoting D.I. 48 at ¶ 100)). The allegations on which I relied in reaching my conclusion as to the amended complaint remain essentially unchanged in the second amended complaint. (*See* D.I. 64 at 6-9 (quoting D.I. 48 at ¶¶ 100-101, 105); D.I. 123-3 at ¶¶ 112, 114, 122). Accordingly, for the reasons previously stated, the second amended complaint adequately pleads parallel threats and each of the plus factors as to Manufacturer Defendants. (*See* D.I. 64 at 6-9).

The allegations against the Dealer Defendants are similar to the allegations against the Manufacturer Defendants. The Manufacturer Defendants threatened to boycott IronPlanet around

13

April 3, 2014. The second amended complaint alleges that Ring Power and Thompson Tractor made similar threats in calls to IronPlanet's CEO between April 2 and April 3, 2014. (D.I. 200 at 14; D.I. 162 at ¶¶ 108-109). This leaves Ziegler. The second amended complaint alleges that Ziegler threatened IronPlanet on March 18, 2014 when Hoeft, as both the Chairman of Associated Auction Services and the Chairman, President, and CEO of Ziegler sent an email to Iron Planet stating, in relevant part, that "Caterpillar and CAT dealers would have significant concerns about any arrangement where IronPlanet is providing auction services for new equipment for a Caterpillar competitor [i.e., ICP]." (D.I. 200 at 15 (citing D.I. 162 at ¶ 104); *see also* D.I. 195-1, Ex. 1). The parties dispute whether Hoeft was acting on behalf of Associated Auction Services or Ziegler when he sent this email. (D.I. 195 at 10; D.I. 200 at 10 n. 3). The parties also dispute whether this threat is sufficiently close in time to the others to qualify as parallel conduct. (D.I. 195 at 16; D.I. 200 at 15). Ultimately, the court does not have personal jurisdiction over Ziegler. *See* Section III(A). Therefore, I will not endeavor to determine at this time whether the second amended complaint alleges parallel conduct by Ziegler. It is sufficient for now that the second amended complaint adequately alleges parallel conduct, in the form of parallel threats, by the other two Dealer Defendants.

For the same reasons given with respect to the Manufacturer Defendants, the second amended complaint also adequately establishes each plus factor as to the Dealer Defendants. First, all the Dealer Defendants had a motive to conspire, because, if all the Dealer Defendants "agreed to issue a boycott threat to IronPlanet, they would all benefit from 'excluding' ICP from the relevant new heavy construction equipment markets." (*See* D.I. 64 at 8 (citing D.I. 48 at ¶ 105); D.I. 162 at ¶ 122). Second, the Dealer Defendants acted against their self-interest because, "by threatening to withhold used equipment sales from IronPlanet, the Manufacturer Defendants—

14

absent an agreement—risked lost sales." (D.I. 64 at 8 (citing D.I. 48 at ¶ 105)); D.I. 162 at ¶ 122). Finally, the second amended complaint contains factual allegations implying a traditional conspiracy. ICP alleged that the Dealer Defendants "all made the same threat," "those threats were made at roughly the same time," and the Dealer Defendants "all employed the same means to exclude ICP from the market." (D.I. 64 at 6 (citing D.I. 48 at ¶¶ 100-01); D.I. 162 at ¶ 112). Accordingly, the second amended complaint adequately alleges circumstantial evidence of an agreement by the Dealer Defendants to boycott IronPlanet.

This leaves Associated Auction Services. ICP cannot show that Associated Auction Services agreed to boycott IronPlanet, because ICP cannot show "parallel conduct." ICP alleges that Defendants made parallel threats to withhold equipment from IronPlanet unless it terminated its relationship with ICP. But Associated Auction Services could not have agreed to withhold equipment from IronPlanet, because Associated Auction Services does not manufacture or distribute new or used heavy construction equipment. It provides online auction services. As a result, the conduct of Associated Auction Services could never be "parallel" to other defendants' conduct, because it operates in a different market than the other defendants. Because ICP has not adequately alleged either direct or circumstantial evidence that Associated Auction Services agreed to boycott IronPlanet, ICP has failed to state an antitrust claim against Associated Auction Services.

### 2. Unreasonable Restraint on Trade

The second element of an antitrust claim—an unreasonable restraint on trade—is analyzed under one of two standards: *per se* or rule of reason. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). The parties dispute which standard applies here (*see* D.I. 195 at 23-24, D.I. 200 at 21-22, D.I. 208 at 14-16), which affects whether ICP must plead a relevant market.

15

"[T]he rule of reason requires the factfinder to decide whether[,] under all the circumstances of the case[,] the restrictive practice imposes an unreasonable restraint on competition." *Ariz. v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343 (1982). Because the rule of reason requires courts to conduct a "fact-specific assessment," courts "usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018); *Lifewatch*, 902 F.3d at 336. Under the *per se* standard, however, "certain agreements or practices[,] which because of their pernicious effect on competition and lack of any redeeming virtue[,] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Railway Co. v. United States*, 356 U.S. 1, 5 (1958). "Such determinations of *per se* illegality are not casually made." *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Const. Trades Council*, 670 F.2d 421, 428 (3d Cir. 1982) "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607–08 (1972).

Whether the rule of reason or *per se* standard applies here is a close call. Not all group boycotts "fall automatically as *per se* violations of the antitrust laws." *Larry V. Muko*, 670 F.2d at 429; *see Lifewatch*, 902 F.3d at 337 n.9 ("some group boycotts, which are similar to concerted refusals to deal, are treated as unlawful *per se*"). Instead, Supreme Court precedent "limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 458 (1986) ("the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor."); *Larry V. Muko*, 670 F.2d at 430 (explaining that in the group boycott context, "it

16

is attempts by competitors to exclude horizontal competitors which trigger the *per se* rule")
(quoting *Protest Boycotts Under the Sherman Act*, 128 U. Pa. L. Rev. 1131, 1151 (1980).
"Horizontal restraints are agreements between competitors at the same level of market structure,
whereas vertical restraints are combinations of persons at different levels of market structure such
as manufacturers and distributors." *Am. Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge,
Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 62 (1st Cir. 2016) (internal
quotations and citations omitted). The issue here is whether the conspiracy alleged in the second
amended complaint qualifies as a "horizontal agreement" to boycott ICP.

The conspiracy alleged in ICP's complaint involves parties from multiple levels of the
market structure. Specifically, ICP is a distributor of new heavy construction equipment. (D.I.
162 at ¶ 61). Defendants are two manufacturers of new equipment (Caterpillar and Komatsu), a
few distributors of new equipment (Ziegler, Ring Power, and Thompson Tractor), and an online
retailer for used equipment (Associated Auction Services). (*Id.* at ¶¶ 8-9, 11-13, 36).

There are several cases both before and after *NYNEX* where a court applied the "*per se*"
label to a group boycott even though not all of the parties were on the same level of the market
structure. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, a retailer organized a conspiracy among
appliance suppliers and their distributors to boycott a competing retailer in the same relevant
market. 359 U.S. 207 (1959). In *Toys "R" Us, Inc. v. FTC.*, a retailer organized a conspiracy
among its key suppliers to boycott other retailers. 221 F.3d 928, 931-32 (7th Cir. 2000). Finally,
in *MM Steel, L.P. v. JSW Steel (USA) Inc.*, a group of steel distributors organized a conspiracy
whereby steel manufacturers refused to supply a competing steel distributor. 806 F.3d 835, 844

(5th Cir. 2015).[1] There are a few differences between the group boycotts in *Klor's*, *Toys "R" Us*, and *MM Steel*, and the conspiracy alleged by ICP. In the group boycott cases only one product market was at issue, and the organizer of the boycott and the target of the boycott were at the same level of the market structure. Here, the conspiracy alleged in ICP's complaint involves two distinct product markets. According to ICP, "new and used heavy construction equipment trade in different relevant product markets." (D.I. 162 at ¶ 33; *see also id.* at ¶ 34 (stating that the markets for new and used heavy construction equipment are "distinct")). Caterpillar organized a conspiracy to exclude ICP from the market for *new* heavy construction equipment by having Defendants refuse to supply IronPlanet with *used* heavy construction equipment until IronPlanet agreed to breach a contract that would have provided a market for ICP to sell *new* equipment.

ICP cites *Tunica Web* for the proposition that the members of the conspiracy and the victim of the conspiracy can be in different product markets and at different levels of the market structure. (D.I. 200 at 22 n.5 (citing *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 413-15 (5th Cir. 2007)). In *Tunica Web*, a group of casino operators in Tunica, Mississippi boycotted the internet advertising company behind the website tunica.com so that the value of the domain name would become worthless, thereby giving the Tunica tourism commission an opportunity to claim the domain name. 496 F.3d at 406-07. The court held that the horizontal requirement set forth in *NYNEX* was satisfied, because there was "an agreement among firms that

---

[1]      Contrary to ICP's assertion, the Supreme Court did not apply the *per se* standard to a group boycott in *Interstate Circuit v. United States*, 306 U.S. 208 (1939). (D.I. 200 at 25). First, the court nowhere uses the words "*per se*" or any similar language. *See, e.g.*, *Klor's*, 359 U.S. at 211-12 (stating that the restraint was "in the forbidden category" of agreements that "from their nature or character were unduly restrictive"). Second, the court analyzed the unreasonableness of the restraint by taking into account the competitors' "wide differences in location and character." 306 U.S. at 230-31. Such analysis is "predicated upon the rule of reason ... and not the *per se* rule." *Royal Drug Co. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984).

18

ordinarily compete with one another at the same level of the market." *Id.* at 412. In other words, the defendants may have been at a different market level than the plaintiff, but all of the defendants were at the same market level. ICP argues that *Tunica Web* applies here, because all of the Manufacturer Defendants and Dealer Defendants "compete with one another ... in the sale of used construction equipment," thereby placing them at the same level in the used equipment market. (D.I. 162 at ¶ 47; D.I. 200 at 22). Even if true,[2] ICP alleges that Associated Auction Services is a part of the conspiracy, and Associated Auction Services is not at the same market level as any of the other defendants regardless of whether I look at the product market for used or new equipment. Accordingly, ICP's alleged conspiracy does not quite fit within the structure set forth in *Tunica Web*.

There is one other reason ICP's alleged conspiracy does not fit neatly within the framework of any of the foregoing cases, where, in all cases brought by private plaintiffs, the target of the boycott was the party that brought the antitrust claims. Here, IronPlanet, not ICP, was the target of the threatened boycott. It was IronPlanet to whom Defendants threatened to refuse to supply used heavy construction equipment. Because the parties did not address this factual difference, it is unclear how, if at all, it would affect which standard applies.

Although ICP's conspiracy does not fit the structure of any of the "*per se*" cases cited to the court, this does not necessarily mean that the *per se* rule does not apply. The Supreme Court has stated that application of the *per se* rule "must be based upon demonstrable economic effect

---

[2]     The complaint does not allege that Caterpillar itself sells used equipment, but that Caterpillar's wholly owned subsidiaries, Cat Financial Services and Caterpillar Used Equipment Services, Inc., sell the used equipment. (*See* D.I. 162 at 48). Nevertheless, ICP attributes these activities to Caterpillar for purposes of analyzing the "horizontal agreement" required for *per se* treatment. It is also not entirely clear how plausible it is that the Dealer Defendants compete with each other, given their geographic distances from each other.

rather than ... upon formalistic line drawing." *State Oil Co. v. Khan*, 522 U.S. 3, 14 (1997).

"Whether to apply a *per se* or rule of reason analysis is a question of law … predicated on a factual

inquiry into the restraint's competitive effect." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A.,*

*Inc*., 779 F.2d 592, 596 (11th Cir. 1986).  It might well be the case that the *per se* rule extends to

situations where defendants use their power in one product market (used equipment) to exclude a

would-be participant in another product market (new equipment).    A group boycott involves a

"concerted refusal to deal with respect to one transaction [here, selling used heavy equipment on

Iron Planet] in order to get the target [here, Iron Planet] to changes its behavior with respect to

another and 'unrelated' transaction [here, selling ICP's new equipment]." Hovenkamp, Antitrust

Law, 3rd ed., Vol. XIII, at 275 (2012).   Thus, I will not decide at this stage of the proceedings

whether the *per se* standard or the rule of reason governs ICP's antitrust claims.[3]  *See In re High-*

*Tech Employee Antitrust Litig*., 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("whether per se or

rule of reason analysis applies…is more appropriate on a motion for summary judgment");

*Continental Airlines, Inc. v. United Air Lines, Inc*., 120 F. Supp. 2d 556, 565 (E.D. Va. 2000)

("Whether the agreement here at issue should be treated as per se unlawful under Section 1 must

await the development of a factual record on the nature and effects of the restraint in the relevant

---

[3]      If the rule of reason applies, the second amended complaint fails to plead a geographic
market for new heavy construction equipment.  Specifically, there are no allegations in the
complaint regarding the geographic confines in which a potential buyer of new heavy construction
equipment rationally looks for that equipment.  Instead, the complaint is replete with allegations
regarding where ICP would like to sell new heavy construction equipment, that is, online through
IronPlanet. (*See*, *e.g*., D.I. 162 at ¶¶ 54-60).  "[T]he geographic market is not comprised of the
region in which the seller attempts to sell its product, but rather is comprised of the area where his
customers would look to buy such a product." *Tunis Bros. Co. v. Ford Motor Co*., 952 F.2d 715,
726 (3d Cir. 1991).  Even the complaint acknowledges that buyers did not traditionally purchase
new heavy construction equipment online. (D.I. 162 at ¶¶ 53, 70).  Instead, buyers traditionally
looked to a local equipment dealer. (*Id*. at ¶ 36).

market."); *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 564–65 (D.N.J. 1998) ("At this early stage of the proceeding, the court does not find it necessary to determine which mode of analysis it will ultimately employ in evaluating the defendants' activities.").  It is enough that the second amended complaint has alleged activities that plausibly place an unreasonable restraint on trade.  The motion to dismiss the antitrust claims against Caterpillar and Komatsu (the only defendants against whom the antitrust claims have not yet been dismissed for other reasons) is denied.

### C.  STATE LAW CLAIMS

In the second amended complaint, ICP asserts claims for tortious interference with contract (Counts 3 and 4), tortious interference with prospective business relations (Counts 5 and 6), civil conspiracy (Counts 7 and 8), and aiding and abetting (Counts 9 and 10).  (D.I. 162 at ¶¶ 146-61). All of these claims are purportedly based on state law (*see, e.g., id.* at ¶ 6), but the claims as written are insufficient.  Plaintiff's complaint has forty-six pages that are an antitrust complaint, and a little over two pages that purports to set out eight state law claims.  Count 3 is representative.  It consists of a heading ("Defendants' Tortious Interference with Contract (Lost Profits)") followed by a sentence incorporating by reference the antitrust complaint followed by one more sentence ("Defendants' conduct as alleged [in the antitrust complaint] constitutes tortious interference with contract."), which is followed by a request for lost profits.  I do not think this complies with Rule 8(a)(2)'s instruction that the pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  I think Plaintiff should comply with that command, which might not be that hard for Caterpillar, but might be more difficult for Komatsu and Associated Auction Services.  I am also not sure why Plaintiff has two identical counts for each state law claim, seeking different remedies, when Rule 8(a)(3) permits "relief in the alternative or different types of relief" in the same count.

21

Defendants complain that the complaint does not identify the particular state on whose law ICP relies. (D.I. 195 at 27).

ICP argues that it is not required at this stage of the proceedings to identify the state on whose law it relies. (D.I. 200 at 32). Defendants argue that the law of North Carolina applies. (*See* D.I. 195 at 27-28). Because ICP has taken no position, it has also not provided its analysis with respect to any choice of law test.[4] It may be that no final determination of the appropriate choice of law can be made at the motion to dismiss stage, but, for purposes of a motion to dismiss, it does not seem appropriate to say that all choice of law concerns can be put off until another day. The issue of which state's law applies can have meaningful consequences. As ICP admits, "there is a difference between Delaware and North Carolina law as to the viability of a claim for aiding and abetting." (D.I. 200 at 36). Accordingly, I expect Defendants will renew their motion to dismiss ICP's state law claims if and when they are properly refiled. I have thought about Defendants' citation to cases dismissing state law claims where the plaintiff "fail[ed] to sufficiently identify those jurisdictions under which it brings its claims." *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012); *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009) (dismissing state law claim because plaintiffs "fail[ed] to link their claim to the law of any particular state"). What I would say is that, in the absence of some allegation in the complaint that a state law claim is based on the law of some state other than Delaware or North

---

[4]    Courts sitting in Delaware determine the applicable law based the "most significant relationship" test, which considers: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Integral Res. (PVT) Ltd. v. ISTIL Grp., Inc.*, 155 F. App'x 69, 71 (3d Cir. 2005).

Carolina, I will limit consideration on a motion to dismiss to no more than the law of those two states.

## IV.    CONCLUSION

For the foregoing reasons, the motions to dismiss filed by Ziegler, Thompson Tractor, and Ring Power (D.I. 182, D.I. 183, D.I. 188) are granted, because the court lacks personal jurisdiction over those defendants. All claims asserted against Ziegler, Thompson Tractor, and Ring Power (Counts 1 – 10) are dismissed without prejudice so as not to preclude their refiling in a court of competent jurisdiction. The motion to dismiss filed by Associated Auction Services (D.I. 191) is granted, because the second amended complaint fails to state any claims against that defendant. The antitrust claims asserted against Associated Auction Services (Counts 1 – 2) are dismissed with prejudice, and the state law claims (Counts 3 – 10) are dismissed without prejudice. The motions to dismiss filed by Caterpillar and Komatsu (D.I. 180, D.I. 190) are granted in part and denied in part. The state law claims asserted against Caterpillar and Komatsu (Counts 3-10) are dismissed without prejudice, but the antitrust claims (Counts 1 and 2) are not dismissed.

An appropriate order was entered on September 30, 2019. (D.I. 237).